**George W. HICKS, Plaintiff in Error,**

**v.**

**STATE of Tennessee, Defendant in Error.**

Court of Criminal Appeals of Tennessee.

April 25, 1972.

Certiorari Denied by Supreme Court
Aug. 7, 1972.

Jack Norman, Sr., Seth Norman, Nashville, for plaintiff in error.

David M. Pack, Atty. Gen., C. Hayes Cooney, Asst. Atty. Gen., Nashville, Arnold Peebles, Jr., Robert Schwartz, Asst. Dist. Attys. Gen., Nashville, for defendant in error.

## OPINION

DWYER, Judge.

A jury found the defendant George W. Hicks guilty of committing murder in the first degree and fixed his punishment at confinement for sixty years. Judgment was duly entered by the trial court on the verdict and after the motion for a new trial was overruled defendant prayed for an appeal which has been granted and seasonably filed.

This homicide occurred on or about Sunday, August 11, 1968, at the former residence of the defendant on Graycroft Avenue in Davidson County. The victim was defendant's ex-wife, to whom he had been married for twenty-eight years. This marriage terminated for all practical purposes in November of 1966 when the defendant left the home place on Graycroft. There were three children of the marriage, all boys. The youngest son was in the custody of the deceased, by court order, and was age thirteen at her death. The other sons were married. The record reflects this youngest son had difficulties with the mother, and at the time of the homicide resided by his choice with his father the defendant. There had been several bills for divorce filed by the parents. The last proceeding granted the father an absolute divorce but the divorce had not become finalized, because there were pending at the time of victim's death the father's petition for custody of the youngest boy, and the mother's motion to reconsider the divorce decree. A hearing on these two matters was scheduled for August 15, 1968.

■ There are over six hundred pages of testimony developed in this record con-

tained in six volumes. Included in this record is the stipulated testimony of the youngest son, given at a prior trial which occurred in October 1969 which resulted in a mistrial. The transcript of the testimony and cross-examination of the young son at the first trial was admitted as evidence at the second trial, over the objection of the defendant. The trial court ruled the record of the previous testimony was competent because the youngster was unavailable for the second trial. The defendant further contends that the circumstantial evidence in this case as a matter of law is insufficient to support the verdict. We have reviewed the voluminous record and in order properly to focus on defendant's assignments of error we will narrate the facts and conclusions we have arrived at from that review with the rule in mind that we need not pro and con the evidence as developed. See Cooper v. State, 123 Tenn. 37, 60–61, 138 S.W. 826, and Hargrove v. State, 199 Tenn. 25, 28, 281 S.W. 2d 692.

This case is grounded on circumstantial evidence. The victim was found on the afternoon of Monday, August 12, 1968, by the young son. Unlawful entry to the house where the homicide occurred was effected by prizing the lock free from the front door. Nothing of value was removed from the house. The deceased had been brutally beaten about the head. Penetrating wounds of the skull had lacerated the brain, caused massive hemorrhages, and resulted in death. Her throat had been lacerated to the extent that the medical examiner related her head was almost decapitated from the body. he further related there were cuts on the arms of the victim. He also related that the wound on the throat could have been inflicted after the victim fell to the floor. A small hatchet found in the trunk of the defendant's car could have inflicted the wounds about the head, in the opinion of the medical examiner. He related the time of death at about 10:15 p. m., August 11, 1968, and that based on the condition of the body the

estimate would be accurate to within three or four hours. The ferocity of the assault left wounds which caused the experienced examiner to relate he had seldom seen a body so badly beaten.

A neighbor youth related that at the scene when the body was being removed the defendant father related to the young son Gary, "that Gary was all that was left now and there was no one left to take him away".

A neighbor woman testified she was out on her back yard patio and saw the deceased enter the back door of deceased's house at 9:00 p. m. The light above the back door went out and a light came on in the back bedroom, the deceased's bedroom. The neighbor then noticed a light come on in the adjacent guest bedroom and she related this was unusual because that guest bedroom was seldom used. There was found in this guest bedroom in the ash tray cigarette butts and a crumpled package of the Tareyton brand. The victim did not smoke.

The testimony of young Gary from the first trial, who had testified as a State witness, reflects that on Sunday, August 11, 1968, his father took him to church that morning. His father picked him up after church, they had lunch and played a round of golf. His father was driving his gold colored VIP model Plymouth car. His father took him back to church and let him out around 6:15 p. m. with the understanding that his aunt, the defendant's sister, would pick him up. He had been told that his father was going out of town that evening. After church services he saw his mother at the church and then went with his aunt to her office which was located in the same building as his father's, arriving around 9:30 p. m. When they arrived at the building the boy noticed the defendant's company station wagon driving down the street and tried to hail it without success. He could not identify the driver other than male. He related that the driver did not look like his father. He called his

brother Gordon, but Gordon did not know anything about who had the station wagon. He also asked his uncle Hulan Vanlandingham and his aunt Juanita if they knew about who had the station wagon that night and they did not know. He believed it was his father's company's station wagon because it was missing from the carport at the office building and because it had the unusual racks on top to carry go-carts.

Another State witness saw a station wagon, which looked exactly like the defendant's company station wagon, empty and parked on a dead-end street within four-tenths of a mile from the decedent's home. She observed the station wagon around 8:15 p. m., August 11. An investigator found Tareyton cigarette butts in the location of where the station wagon was parked.

There was a statement taken from the defendant on the night of August 12, in which he related that he and his wife had been having money troubles which caused their separation. Their troubles included her accusations regarding his association with his secretary a Gwen Sapp, now the present wife of the defendant. He related that he had carried his son by the house on August 13, 1968, and let him out and when he came back his son was crying and said his mother was dead.

An investigator, with permission of counsel at the time of the initial investigation, was permitted to ask defendant about his whereabouts on Sunday, August 11, 1968. Defendant then related to this officer that he had golfed on the afternoon with his son and then had taken him to church and then had driven out to the airport arriving there at 6:45 p. m. He then stated his flight to Chicago was to leave at 10:11 p. m. and he bought a hamburger and french fries which made him ill. He did not see anyone he knew at the airport and then caught his flight to Chicago. He was driving the VIP Plymouth and had parked it in the airport parking lot. He was then asked about his son Gary's state-

ment about seeing the station wagon and he related he had loaned it to a boy named Ken who worked in a service station. He did not mention at that time that he had rented a car at the airport and had driven back to check on his place of business. He did not relate that he had met a former employee, with whom he chatted after mutual recognition, at the car rental booth in the terminal.

The witness Ken Faulks, an acquaintance of the defendant, testified that the defendant called him on the morning of August 13, and told him his wife had been murdered and asked him to do him a favor. At the office of the defendant Faulks was asked by the defendant to tell the police Faulks had possession of the station wagon on August 11 and returned it on Monday, August 12. When he refused the defendant then called his brother-in-law into the office and asked him to tell the police the same story and explain what time he had the station wagon. The defendant explained that he made these efforts because he did not want the company's station wagon involved in the murder and he wanted to avoid any suspicion toward his older son who often used the station wagon.

The proof further reflects that defendant was taking trips with Miss Sapp before the dissolution of his marriage. Defendant's oldest son related he had seen his father and Miss Sapp in an awkward moment at the office. This son was dismissed from his father's company employment by the father on the day of the funeral. The secretary and the defendant are now husband and wife, living in Daytona Beach, Florida, with the youngest son. They are both in executive positions of the company, which is still doing business in Nashville.

The State's proof further discloses that the defendant checked in the airport parking lot at 6:41 p. m. on August 11. The proof further reflects this parking ticket was not turned in on checking out of the lot, but that it came into the State's possession through counsel for the defendant. The proof further reflects that defendant rented a Mercury automobile at the airport at 10:30 a. m., August 11, ostensibly for the purpose of checking his office. He checked in this car at 9:50 p. m. at the airport and caught his 10:11 p. m. flight to Chicago. He arrived in Chicago at 11:25 p. m., checked into a motel at 11:30 p. m. from the airport, checked out at 5:45 a. m. the morning of the twelfth. The housekeeper of the motel testified the commode in defendant's room was stopped up with stringy green-appearing stuff and there was a disagreeable odor in the room. The doctor had testified that blood after a period of time will emit a bad odor. The proof also reflected that defendant ostensibly went to Chicago to get an appraisal of his business, but did not call the party until he was at the airport prior to returning to Nashville. There is also proof that defendant had at one time worked in a packing house and that his work included the slitting of the throats of animals.

The defendant testified and related in substance that he went to the airport, rented the car, checked on his office, went to Chicago, did not notice an odor in the room, returned the morning of the twelfth. He admitted to asking Faulks to lie about the station wagon, admitted to asking his brother-in-law to lie about the station wagon, and denied the killing. He called many character witnesses.

We view the evidence in this circumstantial evidence case under the test delineated in State v. Crawford, Tenn., 470 S.W.2d 610; that is, we must be satisfied from our review beyond a reasonable doubt that the evidence is consistent with guilt and inconsistent with innocence. See also Marable v. State, 203 Tenn. 440, 451–452, 313 S.W.2d 451. The jury has resolved all of the discrepancies and conflicts in the testimony adversely to the defendant and they have accordingly rejected the denial of the defendant that he committed this

atrocious crime. We are satisfied beyond a doubt from this record that the evidence sustains this verdict. In circumstantial evidence cases single facts of themselves may account each for little weight, but when all of the facts and circumstances are put together they may unerringly point the finger of guilt to the defendant to the exclusion of all others beyond a reasonable doubt. The facts as we have related them from our conclusions regarding the total evidence lead us to the ultimate conclusion that the evidence is and was sufficient to so point the finger of guilt and exclude every other reasonable hypothesis. The assignments pertaining to the evidence are accordingly overruled.

Defendant next contends that the trial court erred in a pre-trial hearing on the day scheduled for the trial, in allowing the "in limine" motion of the State to declare the young son an unavailable witness. This procedure we agree is as far as we are able to ascertain unusual to our procedure. Such a hearing would usually be held during the trial at the point where the State's effort to introduce the testimony transcript was met with a defense objection. However, we see no prejudicial effect of this early disposition of the basic issue involved. We think the issue that controls is whether the court erred in allowing into evidence the transcript of the previous trial's testimony of the absent young son, in violation of defendant's right to confront and cross-examine witnesses against him. We think not.

There are three basic components contained in the confrontation clause: (1) Insure the witness will give his statement under oath; (2) subjection of the witness to the greatest legal device ever invented for the ascertainment of truth, cross-examination; and (3) enable the jury to see, judge and weigh the witness' demeanor. See California v. Green, 399 U.S. 149, 90 S.Ct. 1930, 1938, 26 L.Ed.2d 489. Two of these components are present in this record. All authorities from our review point the finger of importance to requirement (2), the cross-examination. In California v. Green, supra, the following may be found:

" . . . Under these circumstances, Porter's statement would, we think, have been admissible *at trial even in Porter's absence if Porter had been actually unavailable,* despite good-faith efforts of the State to produce him." (Emphasis added.)

In this record the same attorney representing the defendant represented him at the inception of the investigation and represented him at the prior trial. At the first trial, counsel conducted a rigorous and extensive cross-examination of the now absent youngster. We hold that the introduction in this trial of the prior trial testimony of the youngster, including the thorough cross-examination by counsel in the prior trial, meets the constitutional requirement of confrontation contained in both the Federal and State constitutions.

As to defendant's assertion that the State did not exert due diligence in a good faith effort to secure this witness for the second trial, we note that the record reflects the youngster was living with his father when the crime was committed, was then thirteen years of age, and was residing in Florida with his father and stepmother Gwen Sapp, under their care and control, the week prior to the second trial, scheduled for January 18, 1971. The defendant related that the youngster did not leave home until Sunday, January 10, 1971. The State had sought his attendance by invoking, on January 6, T.C.A. § 40–2429 et seq., from which a certificate requesting subpoena, and expenses, were prepared and sent to Daytona Beach. Under Florida law a subpoena issuance commanded a hearing on whether the youngster should be ordered back to Tennessee to testify. It is true the Florida process issued only a week before the trial and the unsuccessful efforts to serve the process at the boy's residence and school in Florida did not take place until the Friday before the trial on Monday. Nevertheless, we feel there

was under the circumstances sufficient diligence to show a good faith effort by the State to secure the youngster. If he were reasonably available, the efforts to serve him in Florida on that Friday would have been successful. The trial judge did not abuse his discretionary authority in the matter of finding diligence by the State and in ruling the witness unavailable. The assignment regarding admission of the prior testimony is overruled.

The judgment of the trial court is affirmed.

GALBREATH, J., did not participate in this opinion.

O'BRIEN, J., concurs.