IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
September 20, 2005 Session

## STATE OF TENNESSEE v. WADE P. TUCKER

**Appeal from the Circuit Court for Franklin County**
**No. 13166     J. Curtis Smith, Judge**

---

**No. M2004-02792-CCA-R3-PC - Filed November 22, 2005**

---

This is an appeal as of right from a denial of post-conviction relief. The Defendant, Wade P. Tucker, was convicted of attempted first-degree murder pursuant to a guilty plea, and especially aggravated robbery and aggravated burglary following a bench trial. The Defendant was sentenced to twenty-four years in the custody of the Tennessee Department of Correction (TDOC). This Court upheld the Defendant's attempted murder and especially aggravated robbery convictions on direct appeal, but reversed the conviction for aggravated burglary. See State v. Wade P. Tucker, No. M2001-02298-CCA-R3-CD, 2002 WL 1574998 (Tenn. Crim. App., Nashville, July 17, 2002). The Defendant subsequently filed a petition for post-conviction relief, which was denied. The Defendant now appeals denial of post-conviction relief, arguing: (1) his conviction for attempted first degree murder is void due to a faulty guilty plea; and (2) he received ineffective assistance of trial counsel. We affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Robert G. Morgan and Francis Pryor, Assistant Public Defenders, Jasper, Tennessee, for the appellant, Wade P. Tucker.

Paul G. Summers, Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; J. Michael Taylor, District Attorney General; and Steve M. Blount, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

**I. Background Facts**

The convictions at issue in this case result from the robbery and brutal shooting of the Defendant's estranged wife in her rural Franklin County home during the early morning hours of January 23, 2000. The events leading to the Defendant's convictions were summarized by this Court on direct appeal as follows:

The stipulation of facts revealed that the defendant and the victim were husband and wife. On November 19, 1999, the victim filed a divorce complaint in which she alleged that the defendant had been guilty of "inappropriate marital conduct and adultery." In the complaint, the victim sought custody of the parties' two minor children and asked that she be awarded, inter alia, the parties' jointly-owned house located on Rock Creek Road in Franklin County. As of January 23, 2000, the divorce was still pending, no property rights had been adjudicated, and the defendant was not subject to any order restraining him from going about the victim or the parties' house. The defendant resided at the Dripping Springs Subdivision home of his father, Gerald Tucker, and the victim resided at the Rock Creek Road house. Between November 19, 1999[,] and January 23, 2000, the defendant had been to the Rock Creek Road house on multiple occasions to pick up and drop off the parties' children. On the evening of January 22, 2000, the parties' children were staying at Gerald Tucker's home. Thus, on the night of January 22 and in the early morning hours of January 23, 2000, the victim was the only person staying at the Rock Creek Road house.

At approximately 2:30 a.m. on January 23, 2000, the victim awoke to gunfire and realized that she had been shot. She got up from her bed and was shot again. She saw "a male looking figure near her bedroom door holding a long-barreled gun." The victim fled to a closet, and the assailant, who was wearing a ski mask, came into the closet and shot her again. After the assailant left the closet, the victim crawled toward her bed to get the cordless telephone for the purpose of calling 911. Due to injuries to her hands and arms, she was unable to handle the phone and pushed it along the floor back to the closet. She heard sounds of the assailant moving about in the house. The victim was able to dial 911 with her tongue and ultimately reached the Franklin County Sheriff's Department dispatcher. While the victim was on the telephone, she saw the ski-masked intruder come back to the closet through the glow of the bathroom light. Despite the presence of the ski mask, the victim was able to recognize the intruder as the defendant. She screamed, and the defendant shot her again. The victim "played dead at that time." She heard the defendant in the bedroom opening drawers in her jewelry chest.

Franklin County officers arrived at the Rock Creek Road house pursuant to the 911 call and found the victim in the closet. She was transported to a hospital in Winchester and was ultimately air-lifted to a medical center in Chattanooga. The

victim suffered "multiple gunshot wounds to her chest and neck area, and to her arms and hands." The stipulation of facts reveals that the victim "was severely injured, with said injuries being life threatening [, resulting in her being] disfigured."

Both the defendant's and the victim's lives were insured by a Horace Mann Insurance Company life insurance policy which provided "that, if one of them died, the survivor would receive $300,000."

The officers obtained a sample of the victim's blood, and they recovered shotgun pellets from the victim's bed, the bedroom floor, the closet, the victim's night shirt, and the hospital trauma room where she was treated. The officers also recovered shotgun wadding from the bedroom area and from the victim's person. The officers found the victim's jewelry chest open and drawers pulled out of furniture throughout the house. An outside door was standing open with a window in the door broken. The officers obtained samples of glass from the door. They also found a live, twelve-gauge shotgun shell in the house.

Officers who were dispatched to Gerald Tucker's house arrived at 3:08 a.m. and found the defendant's truck parked outside the house with the "hood of the truck . . . hot to the touch." When the defendant's father led the officers to the defendant's room, "he actually crawled out of the bed and crawled on the floor before standing up with the assistance of his father." He appeared to the officers to be "very shaken."

With the consent of Gerald Tucker, the officers searched his house and found a twelve-gauge shotgun that, despite having been recently cleaned with oil, contained human blood and tissue inside the barrel. The DNA of the blood and tissue inside the shotgun barrel was consistent with the victim's DNA. The officers found particles of glass inside the defendant's truck which proved to be "like and consistent with respect to refractive index" to the glass broken from the door window at the Rock Creek Road house.

In a statement given to the officers, the defendant denied that he had gone to the victim's house and that he had shot her. He admitted to an intimate relationship with a woman named Sabrina Hodge.

On February 18, 2000, a neighbor of Gerald Tucker found a dark plastic bag in a wooded area near the road that leads to the defendant's father's house. Inside the bag, he found a wallet that contained the victim's identification papers. Being aware of the assault against the victim, the neighbor called the TBI. The TBI agent who took custody of the bag found inside, in addition to the wallet, numerous pieces of jewelry, coins, a ski mask, gloves, coveralls, and boots. The plastic bag also contained another plastic bag which contained "numerous love letters and cards" which had been sent to the defendant from Ms. Hodge. The second bag also contained "numerous photos of Sabrina Hodge in revealing underwear clothing."

The victim identified the wallet as hers and the jewelry and coins as her property that had been stored in her jewelry chest prior to the attack. The photographs bore the defendant's fingerprints. The victim identified the ski mask as being similar to the one the defendant wore during the attack. The ski mask and gloves bore particles of glass which "were like and consistent with respect to refractive index"

to the glass broken from the door. Furthermore, via DNA analysis, blood found on the ski mask matched the victim's blood. The coveralls from the bag contained five spent twelve-gauge shotgun-shell casings. Laboratory analysis revealed that all five shells had been fired from the twelve-gauge shotgun found at Gerald Tucker's house. Analysis of the empty shotgun casings found in the coveralls and the live twelve-gauge rounds found in the victim's house and in the defendant's truck revealed that all of the ammunition was "likely manufactured at the same time as each other and were likely packaged together by the manufacturer."

Based upon comparisons made between the pellet pattern of the twelve-gauge shotgun found in Gerald Tucker's house and the pellet pattern found in the victim's nightshirt, TBI laboratory personnel opined that she was shot on at least one occasion from a distance of less than ten feet.

Wade P. Tucker, 2002 WL 1574996, at *1-3.

In March of 2000, a Franklin County grand jury indicted the Defendant on one count of attempted first degree murder, see Tenn. Code Ann. §§ 39-13-202 and 39-12-101, one count of especially aggravated robbery, see id. § 39-13-403, and one count of especially aggravated burglary, see id. § 39-14-404.

## II.  Plea Hearing and Bench Trial

At a hearing conducted in May of 2001, the Defendant entered a guilty plea to the attempted murder charge and pled not guilty to the remaining two charges.[1]  The record reveals that the Defendant elected to proceed on the robbery and burglary charges at a bench trial pursuant to a carefully crafted stipulation of facts.  Furthermore, all three pleas were entered with the understanding of "open" sentencing, with the trial court to determine the Defendant's sentence at a later hearing.

At the plea hearing, the trial court carefully explained to the Defendant the rights he was forfeiting by entering a guilty plea to the charge of attempted murder.  During this colloquy, the court asked the Defendant no less than five times if he had any questions, and each time the Defendant responded, "No, sir."   The court asked the Defendant if he wanted to give up his rights, and he replied, "Yes, sir."  The court asked the Defendant if his attorney had discussed his case with him; if they had discussed possible defenses; and if he was satisfied with his counsel's representation. To each of these questions the Defendant replied, "Yes, sir."  The court asked the Defendant if anyone had forced him to enter his guilty plea, and the Defendant replied, "No, sir." The court asked the Defendant if he had read and discussed with his attorney his written guilty plea, and if he had signed it, and the Defendant replied, "Yes, sir."   As a final question, the court asked: "Mr. Tucker, are you guilty of this offense?"  However, the Defendant did not speak, rather the Defendant's counsel responded as follows: "Your Honor, under the facts and circumstances that we've indicated,

---

[1]Prior to entering his guilty plea to the attempted murder charge in open court, the Defendant had signed a Guilty Plea and Waiver of Rights form as to this charge in April of 2001.

I have, Mr. Tucker has entered this guilty plea willingly and openly. There is simply no way to contravene the scientific evidence, the other evidence indicated, and for that reason he will state he's entering a guilty plea." Whereupon the trial court accepted the plea and found the Defendant guilty of attempted first degree murder.

Based on the stipulated facts entered at the plea hearing, the trial court also found the Defendant guilty of the indicted charge of especially aggravated robbery, and guilty of the lesser-included charge of aggravated burglary.[2]

## III. Sentencing and Direct Appeal

In May of 2001, the Defendant was sentenced as a Range I, standard offender, to twenty-four years for his attempted murder conviction, twenty-four years as a violent offender for his especially aggravated robbery conviction,[3] and five years as a standard offender for his aggravated burglary conviction. The sentences were ordered to be served concurrently, for an effective twenty-four year term in the TDOC. On direct appeal, this Court reversed and vacated the aggravated burglary conviction, but affirmed the remaining convictions and twenty-four year sentences. See Wade P. Tucker, 2002 WL 1574996. In December of 2002, the Tennessee Supreme Court denied further appeal.

## IV. Post-conviction

In November of 2003, the Defendant timely filed a pro se petition for post-conviction relief alleging multiple issues. An attorney was appointed, and an amended post-conviction petition alleging an involuntary guilty plea and ineffective assistance of counsel was filed in March of 2004. The Defendant received a post-conviction hearing in August of 2004.

At the post-conviction evidentiary hearing, the Defendant's trial counsel (Counsel)[4] testified that he met with the Defendant and various members of his family "many times." During these meetings Counsel discussed possible theories of defense, but ultimately determined the evidence against his client was "overwhelming." Counsel therefore advised his client to plead guilty to the attempted murder charge and "seek dismissal of the Especially Aggravated Robbery case because of the deferential in punishment," thereby making the Defendant "eligible for parole as early as possible." When asked if he was aware of Mr. Milton Eidson as a potential witness, Counsel said he was, but elected not to interview him as he believed any effort to do so would have been "futile" considering the substantial evidence against his client.

---

[2]The Defendant had been indicted for especially aggravated burglary.

[3]A conviction for especially aggravated robbery requires 100% service of sentence. See Tenn. Code Ann. § 40-35-501(i)(1) and (2)(E).

[4]The Defendant's trial counsel, against whom the Defendant's allegations of ineffective assistance of counsel were levied, will be referred to only as "Counsel" throughout this opinion.

When asked about employing experts to challenge the State's DNA evidence, Counsel stated he discussed the process, including the cost, with the Defendant and his family, but believed any such efforts would not have helped the case given the "totality of the facts." Counsel testified that he did not believe that the State's scientific evidence "would be contravened" by other experts, and further noted: "You've got to remember in this case there was not only circumstantial evidence, but there was direct evidence in this case."

When asked why he did not pursue government funding to hire expert witnesses to challenge the State's scientific evidence, Counsel stated that he did attempt to have funds held in escrow pursuant to the Defendant's divorce proceedings released for this purpose, but his request was denied. However, Counsel added that the real issue was not a matter of whether his client could afford to hire expert witnesses, but rather that doing so would not, in his opinion, yield any positive results. On cross-examination Counsel testified that he was experienced in criminal law, had previously handled cases where DNA evidence was challenged, and he had fully discussed with the Defendant the pros and cons of proceeding to trial or pleading guilty.

Mr. Milton Eidson, a neighbor of the property where the shooting took place, testified that on the night in question he observed a black Chevrolet pickup in his driveway between 11:30 and 11:45 p.m., and approximately an hour later he heard three gunshots. On cross-examination, Mr. Eidson admitted he was not sure of the exact times of these events as he was not "looking at the clock," and it may have been as late as 3:00 a.m. when he heard the three gunshots. Mr. Eidson testified that the distance between his driveway, where he saw the truck, and the house where the victim was shot, was about six hundred yards.

The Defendant's father, Mr. Gerald Tucker, testified that he accompanied his son in meetings with Counsel "numerous times." During these meetings, Counsel was informed of Mr. Eidson, who could testify to an unidentified individual in a black Chevrolet truck being in the general vicinity the same night as the shooting, and of the Defendant's claim that his girlfriend's ex-husband kidnapped him at gunpoint and forced him to participate in the shooting of the victim. However, Mr. Tucker believed Counsel never followed up on either of these defense theories. Mr. Tucker also stated that Counsel informed him that hiring outside experts to challenge the State's DNA evidence would be very expensive, but failed to inform him that government funding may have been available for such a challenge.

Additionally, two of the Defendant's aunts and his sister also testified that they met with Counsel and made him aware of possible leads on alternative defense theories, but Counsel failed to pursue them.

The Defendant did not testify at his post-conviction hearing.

In a September 2004 order the trial court denied the Defendant's petition for post-conviction relief. In this order, the court made detailed findings and concluded that Counsel's "strategic and tactical choices were reasonable in light of the state's overwhelming proof in this case and should

not now be second-guessed." Thus, it found that the Defendant failed to show any evidence of deficient representation by his trial counsel. As to the claim of an involuntary guilty plea, the court noted that the Defendant "did not take the stand at the post-conviction hearing and presented no proof" as to this claim, thereby rendering it meritless. This appeal followed.

## ANALYSIS

The Defendant first alleges that his conviction for attempted murder is void because he never audibly admitted guilt at the plea hearing. The Defendant also claims his trial attorney was constitutionally deficient in two respects: (1) Counsel failed to interview potential witnesses, and (2) Counsel failed to seek funding for independent review of the State's scientific evidence. We disagree.

### I. Standard of Review

To sustain a petition for post-conviction relief, a defendant must prove his or her factual allegations by clear and convincing evidence at an evidentiary hearing. See Tenn. Code Ann. § 40-30-110(f); Momon v. State, 18 S.W.3d 152, 156 (Tenn. 1999). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. See Momon, 18 S.W.3d at 156; Henley v. State, 960 S.W.2d 572, 578-79 (Tenn. 1997). The trial judge's findings of fact on a petition for post-conviction relief are afforded the weight of a jury verdict and are conclusive on appeal unless the evidence preponderates against those findings. See Momon, 18 S.W.3d at 156; Henley, 960 S.W.2d at 578.

### II. Void Guilty Plea

In the Defendant's first issue on appeal, he claims that "the judgment of guilt to attempted murder in the first degree [is] void because [he] never admitted guilt at the plea proceeding." To support this assertion the Defendant argues that while he affirmed that he understood the rights he was surrendering and that he had signed a written guilty plea, he never himself audibly said he was guilty. Rather, his trial counsel answered in the affirmative for him. The Defendant argues that his plea is therefore void, and his plea proceeding was constitutionally deficient, violating his due process rights as guaranteed by Article I, section 9 of the Tennessee Constitution and the Sixth Amendment to the United States Constitution.

The Defendant admits that he failed to raise this issue on direct appeal, or in his post-conviction petition, or at his post-conviction hearing, but argues that it is not waived because his judgment of guilt is "void ab in nitio" [sic] and therefore not subject to waiver. Alternatively, the Defendant argues that this is an "exceptional circumstance[]" wherein this Court can address the issue on its own accord as a matter of plain error, citing State v. Manning, 500 S.W.2d 913, 914 (Tenn. 1973).[5] The State argues that the Defendant has waived this issue for failure to include it in the post-conviction petition or raise it at prior proceedings.

---

[5]Manning was a direct appeal, not an appeal of a post-conviction judgment.

We begin our analysis by noting that the Defendant's conviction would be at most voidable, and not void. The Defendant has not provided any authority, and we know of none, to support his claim that failing to personally answer "yes" when asked "are you guilty?" at a guilty plea hearing renders his judgment of conviction void on its face.[6] Rather, the well established standard for challenging the validity of a plea proceeding and a potentially void (i.e. voidable) guilty plea is set forth in Boykin v. Alabama, 395 U.S. 238 (1969), and State v. Macky, 553 S.W.2d. 337 (Tenn. 1977). However, in this case, the Defendant has waived any potential Boykin or Macky claim with regard to not audibly admitting his guilt by failing to raise this issue in his post-conviction petition or at prior proceedings.[7]

The record reveals that the Defendant did not raise the issue of a "void" conviction in his post-conviction petition or before the post-conviction court. It is settled law that an issue not presented in the petition for post-conviction relief or any of its amendments "may not be raised for the first time on appeal." State v. Townes, 56 S.W.3d 30, 35 (Tenn. Crim. App. 2000), rev'd on other grounds, State v. Terry, 118 S.W. 3d 355 (Tenn. 2003). See also Tenn. Code Ann. § 40-30-106(g) ("A ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented."). Moreover, plain error analysis is not available in an appeal of a post-conviction denial. See State v. West, 19 S.W.3d 753, 756-57 (Tenn. 2000). Accordingly, this issue is waived.

## III. Ineffective Assistance of Counsel

The Defendant also asserts that his trial attorney was constitutionally deficient in two respects relating to his defense: (1) Counsel failed to interview a potential witness, and (2) Counsel failed to "seek funding to provide resources for independent review of forensic evidence." The Defendant further argues that these deficiencies led to actual prejudice and he is therefore entitled to post-conviction relief.

Both the Sixth Amendment to the United States Constitution and Article I, Section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. See State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the

---

[6]We note that a defendant is allowed to enter a plea of guilty when he or she believes it is in their best interest to accept a plea bargain, but while still maintaining his or her innocence. See North Carolina v. Alford, 400 U.S. 25, 37-38 (1970). Accordingly, it is well settled law that a guilty plea may be accepted, and a judgment of conviction entered, without the defendant actually admitting he or she is guilty.

[7]We note the Defendant raised an involuntary guilty plea claim in his original pro se post-conviction petition, however, his argument was that his plea agreement was violated when he was sentenced to serve 100% of his especially aggravated robbery conviction. We note that the record reveals that the Defendant never entered into a plea agreement, and this argument was not raised at the post-conviction hearing when the Defendant was represented by counsel.

range of competence demanded of attorneys in criminal cases. See Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

A lawyer's assistance to his or her client is ineffective if the lawyer's conduct "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." Strickland, 466 U.S. at 686. This overall standard is comprised of two components: deficient performance by the defendant's lawyer, and actual prejudice to the defense caused by the deficient performance. See id. at 687; Burns, 6 S.W.3d at 461. The defendant bears the burden of establishing both of these components by clear and convincing evidence. See Tenn. Code Ann. § 40-30-110(f); Burns, 6 S.W.3d at 461. The defendant's failure to prove either deficiency or prejudice is a sufficient basis upon which to deny relief on an ineffective assistance of counsel claim. See Burns, 6 S.W.3d at 461; Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996).

This two-part standard of measuring ineffective assistance of counsel also applies to claims arising out of a guilty plea. See Hill v. Lockhart, 474 U.S. 52, 58 (1985). The prejudice component is modified such that the defendant "must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Id. at 59; see also Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." See Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

A trial court's determination of an ineffective assistance of counsel claim presents a mixed question of law and fact on appeal. See Fields v. State, 40 S.W.3d 450, 458 (Tenn. 2001). This Court reviews the trial court's findings of fact with regard to the effectiveness of counsel under a de novo standard, accompanied with a presumption that those findings are correct unless the preponderance of the evidence is otherwise. See id. "However, a trial court's conclusions of law--such as whether counsel's performance was deficient or whether that deficiency was prejudicial--are reviewed under a purely de novo standard, with no presumption of correctness given to the trial court's conclusions." Id.

### A. Failure to Interview a Potential Witness

The Defendant argues that Counsel provided deficient representation because he knew Mr. Eidson was a potential witness, but failed to interview him. The Defendant asserts that Mr. Eidson testified at the post-conviction hearing that an unidentified person was in the same general vicinity of the crime scene the night of the incident. Mr. Eidson testified that this person was in a black

Chevrolet pickup, and that he heard gunshots between midnight and 1:00 a.m.[8]  The Defendant now claims that Mr. Eidson's testimony contradicted the State's evidence, and Counsel's failure to discover this testimony prior to his guilty plea and bench trial amounted to deficient representation which prejudiced him.

It appears that the Defendant's argument is actually a claim of inadequate investigation prior to the guilty plea.  However, the argument is also directed at the failure to subpoena the witness to the Defendant's trial.  To prevail on an ineffective assistance of counsel claim with regard to failure to subpoena or produce a potential witness, the defendant must 1) produce the witness at the post-conviction hearing, 2) show that trial counsel could have located the witness, and 3) "elicit both favorable and material testimony from the witness." Denton v. State, 945 S.W.2d 793, 802-03 (Tenn. Crim. App. 1996) (citing Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)).  In the case at hand, the Defendant produced the allegedly overlooked witness at the post-conviction proceeding, and Counsel admitted that he was made aware of this potential witness.  We again note that the Defendant's conviction for attempted first degree murder was based upon his guilty plea, not a trial on the merits.  We also note that his conviction for aggravated robbery followed a bench trial with all facts being stipulated.

Mr. Eidson testified at the post-conviction hearing that he heard shots, but added that it was not unusual to hear gunshots in the rural area in which he lived.  He also stated that he was not sure of the time he heard the shots, and they may have occurred as late as 3:00 a.m. the morning of the incident.  Therefore, the shots Mr. Eidson heard did not contradict the time frame advanced by the State and documented by the 911 call.  Moreover, the Defendant failed to present any potential defense theory in which the black Chevrolet truck observed by Mr. Eidson in his driveway, which was some six hundred yards from the house in which the victim was shot, would have served as material evidence.  In short, we fail to see how Mr. Eidson's testimony was particularly favorable to the Defendant, and we conclude that it was not material to his case.  We are unconvinced that interviewing this witness would have caused Counsel to alter his opinion that the Defendant should plead guilty to attempted murder.  We are also unconvinced that this witness's statement would have modified counsel's strategy to submit the remaining charges to the judge upon stipulated facts.  Accordingly, we find that Counsel's decision not to interview Mr. Eidson in no way prejudiced the Defendant.

### B.  Failure to pursue funds to challenge the scientific evidence
In the Defendant's last issue on appeal, he claims that his trial attorney provided ineffective assistance of counsel by failing to declare his client indigent and pursue government funding to hire independent experts to review and potentially challenge the State's forensic evidence.  In support of this claim, the Defendant argues that case law requires the appointment of expert assistance when an indigent defendant has shown assistance "is necessary" for a constitutionally adequate defense, quoting from State v. Barnett, 909 S.W.2d 423, 431 (Tenn. 1995), and citing State v. Scott, 33

---

[8]Testimony was submitted at the post-conviction hearing that the Defendant's truck was a grey Toyota, and the stipulated facts placed the shooting of the victim at 2:30 a.m.

S.W.3d 746 (Tenn. 2000) (holding that an indigent defendant was entitled to state-funded expert assistance in the area of DNA analysis).

We conclude the Defendant has failed to establish that Counsel performed deficiently when he determined that it would have been "futile" to pursue funds for independent review of the scientific evidence because he did not believe "it would be contravened." In <u>Barnett</u>, our supreme court held that a defendant should be granted access to an "independent psychiatric expert" only after proving a "particularized need" through showing that the facts and circumstances of his particular case would require an expert in order to "insure a fair trial." <u>Barnett</u>, 909 S.W.2d at 431. However, the Defendant in this case provided only unsupported assertions that independent scientific experts <u>may</u> have been helpful to his case. Thus, the Defendant failed to demonstrate that independent expert testimony was "necessary" to insure he received a fair trial.

Additionally, the facts in <u>Scott</u> are distinguishable from the Defendant's case in several crucial aspects: in <u>Scott</u>, our supreme court noted that "the State did not have an overwhelming case" against the defendant; the victim "could not identify her attacker"; and "the DNA evidence appears to have been the keystone of the State's case." <u>Scott</u>, 33 S.W.3d at 755. Conversely, in this case the trial court characterized the evidence against the Defendant as "the state's overwhelming proof"; the victim did identify the Defendant as her attacker; and while the State utilized DNA evidence, it also had direct evidence in the form of the victim's testimony as well as a substantial amount of other forensic circumstantial evidence that could properly be considered to "unerringly point the finger of guilt to the defendant to the exclusion of all others beyond a reasonable doubt." <u>Hicks v. State</u>, 490 S.W.2d 174, 178 (Tenn. Crim. App. 1972).

Because we find the Defendant's representation by Counsel was not deficient with regard to Counsel's election not to pursue independent investigation of the scientific evidence, we need not address the <u>Strickland</u> prejudice prong. Accordingly, the Defendant has failed to prove by clear and convincing evidence that he received representation that fell outside the range of reasonable professional assistance. This issue is without merit.

## CONCLUSION

Based on the foregoing reasoning and authorities, we affirm the judgment of the court denying post-conviction relief.

_____
DAVID H. WELLES, JUDGE

-11-