# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 3, 2009 Session

## STATE OF TENNESSEE v. JEFFREY D. ALLEN

**Direct Appeal from the Circuit Court for Crockett County**
**No. 3704      Clayburn Peeples, Judge**

---

**No. W2008-01348-CCA-R3-CD  -  Filed August 17, 2009**

---

The defendant, Jeffrey D. Allen, was convicted by a Crockett County jury of first degree felony murder, criminally negligent homicide, facilitation of attempted first degree murder, and attempted especially aggravated robbery.  On appeal, he argues that the sequestered jury was improperly separated and that the trial court erred by not suppressing his statement to police, ruling a witness unavailable, admitting prior bad act evidence, and allowing improper opinion evidence.  Following our review, we affirm the judgments of the trial court but remand for entry of a corrected judgment form to reflect that the defendant received a life sentence for his first degree murder conviction.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded for Entry of Corrected Judgment**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, J., joined. CAMILLE R. MCMULLEN, J., filed a dissenting opinion.

Michael A. Carter, Milan, Tennessee, for the appellant, Jeffrey D. Allen.

Robert E. Cooper, Jr., Attorney General and Reporter; David H. Findley, Assistant Attorney General; Garry G. Brown, District Attorney General; and Edward L. Hardister, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTS

According to the State's proof at trial, on January 22, 2003, the defendant and three others, Chad Bricco, Eugene Spivey, and Quantel[1] Taylor, went to the Crockett County home of fifty-six-

---

[1] It is unclear from the record whether the correct spelling is "Quantel" or "Quentell."

year-old Leonard Neely and his fifty-five-year-old brother, Lewis,[2] with the intent to rob and kill them. The victims were known to sell liquor from their home and rumored to keep large amounts of cash on hand. The defendant and Spivey, who were armed with a .40 caliber pistol, gained entry to the home under the pretense of wanting to buy some liquor, while Taylor and Bricco waited outside with a shotgun. Once inside, either the defendant or Spivey began firing the pistol, shooting Leonard multiple times and Lewis twice before fleeing the scene with their companions in the defendant's girlfriend's vehicle. Later that night, Leonard Neely was found dead as a result of his wounds inside the residence. Lewis survived the shooting but was unable to provide any assistance to investigators due in large part to a series of strokes and seizures that predated the shooting, which made it difficult for him to communicate.

The defendant, who was almost immediately developed as a "person of interest" based on information supplied by the victims' neighbors, was initially interviewed by police on March 23, 2003. In that interview, the defendant denied any involvement in the crimes and claimed that he had been babysitting his girlfriend's children in Ripley on the night of the incident. Approximately two years later, investigators received a tip that the murder weapon belonged to Ripley Police Officer Debbie Kirkpatrick, who was Chad Bricco's mother. When ballistics testing confirmed the information, Bricco gave a statement admitting his involvement in the crimes and implicating the defendant, Spivey, and Taylor.

On March 18, 2005, the defendant was booked into the Crockett County Jail on a probation violation warrant. One to two days later, Bricco, Spivey, and Taylor were each charged by warrant with first degree murder, attempted first degree murder, and especially aggravated robbery. The defendant then gave a second statement in which he continued to deny any involvement in the crimes. In the second statement, however, the defendant added the new information that on the night of the murder, Spivey and Bricco had borrowed his girlfriend's vehicle for approximately forty minutes. He also said that the next day they offered to sell him a .40 caliber pistol. The defendant explained that his bloody fingerprints might have gotten on the weapon because he had touched it while his hand was bleeding from a recent cut.

On April 5, 2005, the Crockett County Grand Jury returned an indictment against the defendant in connection with the instant case, charging him with one count of first degree premeditated murder, one count of felony murder, one count of attempted first degree murder, and one count of especially aggravated robbery. On May 11, 2005, while still in jail and before a lawyer had been appointed to represent him, the defendant initiated a third statement in which he admitted that he went to the victims' residence with the intent to rob them. He denied, however, that he had planned to kill the victims and claimed that Spivey, not he, was the shooter.

On July 14, 2006, the defendant filed a motion to suppress his May 11 statement on the grounds that it was obtained in violation of his Fourth Amendment right to be free from unreasonable search and seizure and his Sixth Amendment right to the assistance of counsel. At the

---

[2] We note that this victim's name is spelled "Louis" throughout the trial transcript.

August 25, 2006, hearing on the motion, Chief Deputy Jeff Sills of the Crockett County Sheriff's Department testified that on March 18, 2005, the defendant was arrested from the Dyer County Jail on a "charge of violation of probation out of [Crockett County] Circuit Court" and booked into the Crockett County Jail, where he was held on a $10,000 bond. He said that the first degree murder and especially aggravated robbery charges were not added until April 11, 2005, after the defendant had been indicted in circuit court for those offenses. He knew the charges were not added until that date because he was the one who told the jailers to add them to the defendant's current booking after the defendant had been served with a capias at the jail. In addition, he had the defendant's "NCIC sheet" showing that the only charge entered on the day the defendant was booked into the jail was the probation violation charge.

Chief Deputy Sills further testified that the defendant's three companions were charged by warrant and taken into custody one to two days later. He acknowledged that they each gave statements implicating the defendant in the crimes and that the defendant was a suspect in those crimes at the time he was booked on the probation violation. He said, however, that although the defendant was "being investigated for his involvement in the murder charge, . . . [h]e was being held on the [probation] violation . . . up until the time he was indicted in April." He testified that it was his understanding that the defendant was placed in solitary confinement at the jail at his own request due to problems he was experiencing with other inmates.

The transcript of the May 11 interview, which was admitted as evidence at the hearing, began with the defendant twice affirming that he had sent word that he wanted to talk to the sheriff about the case. Chief Deputy Sills read the defendant his rights, and the defendant said that he understood his rights and wished to make a statement. Chief Deputy Sills then asked that the defendant sign and initial the waiver of rights form. At that point, the following exchange transpired:

Q.      SHERIFF [TROY] KLYCE:    This is Sheriff Klyce talking now. Jeffrey, have you been appointed a lawyer to represent you in this case?

A.      No, sir.

Q.      You don't have an attorney?

A.      (No verbal response.)

Q.      So you haven't talked to an attorney about this case?

A.      No, sir.

Q.      (By Jeff Sills) To clear up matters, you did go to court. You was [sic] indicted on this charge. You have been taken in front of the Circuit Court Judge and arraigned on the charge of first degree murder. Right?

A.    Yes, sir.

Q.    And during court proceedings, the Judge told you that he was gonna [sic] get you an attorney appointed to you.  Correct?

A.    He said in about two or three days he was gonna [sic] send somebody (unintelligible) Public Defender what I know and nobody hadn't [sic] got in touch with me.  (Unintelligible.)

Q.    (By Sheriff Klyce)    You haven't talked to anybody yet?

A.    Nobody.

Q.    (By Jeff Sills)  And you don't want an attorney present now?

A.    I'm just gonna [sic] speak the truth about what happened about that murder scene.

Q.    Okay.

After the defendant finished his account of the crimes, he explained why he decided to make the statement:

> 'Cause my mother -- me and my mother was talking about that and then there was something that you told me back there.  I don't remember the exact words.  You said, "You've got a Bible.  You need to read that." I've done read that whole Bible and a whole lot of things -- you know what I'm saying, -- that came to me.  Like my mother told me, she said, "Baby, go on and talk to Troy."  You know what I'm saying? She said, "Tell Troy and them exactly what happened.  Don't lie.  Don't tell them no lie."  She told me to tell you that today at visitation.

At the hearing, the prosecutor informed the court that his records reflected that the defendant was indicted on April 5, 2005, and arraigned on April 11, 2005.  After noting that the defendant's initial counsel was not appointed until June 13, 2005, approximately two months after the defendant's arraignment on the murder charges, the trial court observed that the delay was caused by the difficulty in finding a lawyer in the area qualified to represent a defendant in a first degree murder case.  At the conclusion of the hearing, the  court denied the motion to suppress, finding no constitutional violations in the defendant's voluntary statement.  The trial court's ruling states in pertinent part:

> In this case I think you have to start the time that you're talking about on April 11th, the date that he was arraigned.  Is a month a long time in a case this serious for a lawyer not to have contacted him?  It absolutely is a long time.  The

-4-

question is, does he have a constitutional right to have any voluntary statement he makes thirty days later excluded and . . . granted the inherently coercive nature of confinement, I don't see anything beyond that in that statement or in the testimony. I don't think the Sheriff's Office could have done a better job of making sure that he was voluntarily doing what he was doing. . . . .

At this point, absent some authority that has not been shown me, I don't think the Constitution protects that. As lamentable and regrettable as it is, I don't think the Constitution protects him from doing that.

On May 7, 2007, the defendant filed a motion in limine to exclude the statement on the basis that it was the product of coercion, in violation of his Fifth Amendment rights. Specifically, he alleged that the two-month period he spent in solitary confinement at the jail without access to a lawyer, combined with the persuasive statements made by law enforcement personnel, rendered his statement involuntary and unknowing despite the presence of Miranda warnings. At the June 4, 2007, hearing on that motion, the defendant testified that he was held in solitary confinement during the period between his March 18, 2005, arrest and his May 11, 2005 statement. During that time, in which he never saw a lawyer, the sheriff and Chief Deputy Sills made comments about how he should talk because his three companions were going to "pin" the crimes on him. In addition, one of them told him that "they were gonna fry [him]" and Sheriff Klyce told him that he needed to be reading his Bible.

On cross-examination, the defendant acknowledged that he had an extensive record of felony convictions and had served nine years for a 1995 aggravated robbery conviction. He said that the sheriff and the deputy told him that he should let them know if he ever wanted to talk to them and that after thinking about it for a while, he gave the statement. On redirect, the defendant testified that he was placed in solitary confinement for fighting with another inmate. He denied that he requested to be put in solitary confinement.

Chief Deputy Sills testified that he never threatened the defendant and was not responsible for his having been in solitary confinement; his understanding was that the solitary confinement resulted from a conversation the defendant had with the sheriff. He denied he ever made any comment about the defendant's "being fried" and said that he never approached the defendant about giving a statement. However, he and the defendant talked at different times, usually due to the defendant's striking up a conversation with him. He recalled that the defendant told him that his mother said that he "needed to get right about things" and to "get into his Bible." He testified that he thought the sheriff gave the defendant access to a Bible and that "there was a statement made that he [the defendant] needed to read the Bible." Sills testified that he read the Bible himself and did not see anything wrong with the statement.

At the conclusion of the hearing, the trial court denied the motion, finding that any conversations the deputy or sheriff may have had regarding the facts of the crimes after the

defendant's incarceration were inappropriate, but their conversations did not vitiate the voluntariness of the defendant's statement.

The defendant was tried alone before a Crockett County jury from April 2-4, 2008. In addition to his statement of admission, the State presented evidence to show, among other things: that the defendant's three companions had given statements implicating the defendant in the crimes; that the defendant had told his girlfriend of his plan to rob the victims; that the defendant and his companions had borrowed the girlfriend's car on the day of the robbery and that the defendant's blood was found in the girlfriend's car.

At the conclusion of the trial, the jury convicted the defendant of first degree felony murder, criminally negligent homicide, facilitation of attempted first degree murder, and attempted especially aggravated robbery. The jury sentenced the defendant to life for the first degree murder conviction. After a sentencing hearing, the trial court sentenced the defendant as a Range II offender to concurrent terms of twenty years for the facilitation of attempted first degree murder conviction, twenty years for the attempted especially aggravated robbery conviction, and four years for the criminally negligent homicide conviction, and ordered that the sentences be served consecutively to the life sentence for first degree murder.

## I. Denial of Motions to Suppress and/or Exclude Statement

The defendant first contends that the trial court erred by not suppressing his May 11, 2005, statement to police, arguing that the statement was obtained in violation of his Fourth, Fifth, and Sixth Amendment rights. He cites Massiah v. United States, 377 U.S. 201, 84 S. Ct. 1199 (1964), to argue that the trial court's failure to timely appoint counsel violated his Sixth Amendment right to counsel. Citing, *inter alia*, State v. Huddleston, 924 S.W.2d 666 (Tenn. 1996), and Rule 5 of the Tennessee Rules of Criminal Procedure, he further argues that his long detention in solitary confinement without access to counsel violated his Fourth Amendment right to be free from unreasonable search and seizure. Finally, he argues that under the totality of the circumstances his statement was unknowing and involuntary, violating his Fifth Amendment right not to incriminate himself. The State argues that the trial court properly denied the motions to suppress the statement. We agree with the State.

When this court reviews a trial court's ruling on a motion to suppress evidence, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). The party prevailing at the suppression hearing is afforded the "strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence." State v. Keith, 978 S.W.2d 861, 864 (Tenn. 1998). The findings of a trial court in a suppression hearing are upheld unless the evidence preponderates against those findings. See id. However, the application of the law to the facts found by the trial court is a question of law and is reviewed *de novo*. See State v. Yeargan, 958 S.W.2d 626, 629 (Tenn. 1997).

A defendant's Sixth Amendment right to counsel attaches when the adversarial judicial process has begun. Montejo v. Louisiana, __ U.S. __, 129 S. Ct. 2079, 2085 (2009); Brewer v. Williams, 430 U.S. 387, 401, 97 S. Ct. 1232, 1240 (1977); State v. Rollins, 188 S.W.3d 553, 565-66 (Tenn. 2006). "[T]he clear rule of Massiah is that once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." Brewer, 430 U.S. at 401, 97 S. Ct. at 1240 (footnote omitted). In Tennessee, the adversarial judicial process is initiated upon the filing of the formal charge, which includes the arrest warrant, indictment, presentment, or the preliminary hearing in cases in which a warrant was not obtained prior to the defendant's arrest. See Rollins, 188 S.W.3d at 566; State v. Mitchell, 593 S.W.2d 280, 286 (Tenn. 1980); State v. Jackson, 889 S.W.2d 219, 222 (Tenn. Crim. App. 1993).

A criminal defendant also has a right to counsel that is encompassed within his Fifth Amendment right against self-incrimination. See Miranda v. Arizona, 384 U.S. 436, 444, 86 S. Ct. 1602, 1612 (1966); Huddleston, 924 S.W.2d at 669. Both the United States and Tennessee Constitutions protect a defendant from being compelled to give evidence against himself. See U.S. Const. amend. V; Tenn. Const. art. I, § 9. Thus, to be admissible at trial, a confession made while under custodial interrogation must be shown to have been freely and voluntarily made, after the defendant's knowing waiver of his constitutional right to remain silent and to have an attorney present during questioning. See Miranda, 384 U.S. at 444, 86 S. Ct. at 1612. In Rollins, our supreme court applied Patterson v. Illinois, 487 U.S. 285, 108 S. Ct. 2389 (1988), to conclude that when a defendant is adequately informed of "'the dangers and disadvantages of self-representation'" by properly executed Miranda warnings, "his waiver of his Sixth Amendment right to counsel at such questioning is 'knowing and intelligent.'" 188 S.W.3d at 566 (quoting Patterson, 487 U.S. at 300, 108 S. Ct. at 2389).

In Montejo v. Louisiana, submitted by the State as supplemental authority in the case, the United States Supreme Court overruled Michigan v. Jackson, 475 U.S. 625, 106 S. Ct. 1404 (1986), which forbade police from initiating interrogation of a criminal defendant once he has requested counsel at an arraignment or other similar proceeding. Montejo, __ U.S. at __, 129 S. Ct. at 2091. The Court concluded that the marginal benefits of the Jackson rule were outweighed by the substantial costs to the truth-seeking process and the criminal justice system, noting that the purpose behind the rule – to prevent police from badgering defendants into waiving their previously asserted rights – was already largely met by the protections afforded by Miranda, Edwards v. Arizona, 451 U.S. 477, 101 S. Ct. 1880 (1981), and Minnick v. Mississippi, 498 U.S. 146, 111 S. Ct. 486 (1990):

> These three layers of prophylaxis are sufficient. Under the Miranda-Edwards-Minnick line of cases (which is not in doubt), a defendant who does not want to speak to the police without counsel present need only say as much when he is first approached and given the Miranda warnings. At that point, not only must the immediate contact end, but "badgering" by later requests is prohibited. If that regime suffices to protect the integrity of "a suspect's voluntary choice not to speak outside his lawyer's presence" before his arraignment, [Texas v.] Cobb, 532 U. S. [162,] 175, 121 S. Ct. 1335 [(2001)] (Kennedy, J., concurring), it is hard to see why it would not

also suffice to protect that same choice after arraignment, when Sixth Amendment
rights have attached.

Montejo, __ U.S. at __, 129 S. Ct. at 2090.

The defendant does not dispute that he initiated the May 11 interview or that he was provided
with Miranda warnings prior to giving the statement. Instead, he contends that "[a]ny argument by
the government that [he] waived his right to an attorney . . . because [he] was mirandized is
irrelevant" because his Sixth Amendment right to counsel had already been violated by the
excessively long period he spent in solitary confinement without having counsel appointed to
represent him. We respectfully disagree.

The Sixth Amendment guarantees an accused the right to the assistance of counsel at
"'critical' stages in the criminal justice process 'where the results might well settle the accused's fate
and reduce the trial itself to a mere formality.'" Maine v. Moulton, 474 U.S. 159, 170, 106 S. Ct.
477, 484 (1985) (quoting United States v. Wade, 388 U.S. 218, 224, 87 S. Ct. 1926, 1931 (1967)).
The transcript of the April 11, 2005 arraignment, which the defendant filed as a supplement to the
record, reflects that the lawyer the trial court attempted to appoint at the hearing had a conflict.
When the court recalled the defendant later that same day, it stated that it needed time to "study" the
matter and to ensure that the counsel appointed was qualified for a first degree murder case and
would be able to continue representation throughout the pendency of the case. The court expressed
its intention of completing the appointment "within the next two days." Obviously, the trial court
was unable to find qualified counsel within that time frame. However, prior to the May 11 interview,
the defendant had not undergone any critical stage in the criminal process at which he needed the
assistance of counsel in order to ensure a fair outcome to his case. The defendant himself initiated
the interview, as he affirmed in his statement, and explained that he was motivated to do so by his
mother's exhortations and his own reading of the Bible.

We also disagree with the defendant's contention that the statement should have been
suppressed under the totality of the circumstances on the basis that it violated his Fifth Amendment
right to be free from self-incrimination. The defendant asserts that the period he spent in solitary
confinement without access to counsel, during which time law enforcement personnel "both
encouraged and threatened" him to give a statement, rendered the statement unknowing and
involuntary despite the presence of Miranda warnings. However, as the State points out, the record
reveals that the defendant had a lengthy criminal history and had been repeatedly Mirandized,
including just before giving the May 11 statement. Thus, the defendant was obviously familiar with
the criminal justice system. Furthermore, the defendant still had contact with the outside world
despite being in solitary confinement, as evidenced by his May 11 statement in which he explained
that he was motivated to speak to the officers by the advice his mother had just given him during her
recent visitation. Finally, although Chief Deputy Sills acknowledged that either he or the sheriff
encouraged the defendant to read his Bible, he denied that he initiated any conversation with the
defendant about the crimes or that the defendant was threatened or coerced into giving the statement.

The evidence, therefore, does not preponderate against the trial court's finding that the statement was voluntary.

The defendant also contends that the statement should have been suppressed on Fourth Amendment grounds pursuant to the holding in Huddleston, 924 S.W.2d at 670, and Rule 5 of the Tennessee Rules of Criminal Procedure, because he was not timely brought before a judge on the probation violation charge for which he was arrested. The State argues, *inter alia*, that the defendant suffered no Fourth Amendment violation because he was lawfully arrested and detained pursuant to a probation violation warrant.

In Huddleston, our supreme court concluded that a statement given after more than forty-eight hours' detention, following a warrantless arrest and without a judicial determination of probable cause, should be suppressed on Fourth Amendment grounds unless the State establishes that it "'was *sufficiently* an act of free will to purge the primary taint of the unlawful invasion.'" 924 S.W.2d at 674 (quoting Brown v. Illinois, 422 U.S. 590, 598, 95 S. Ct. 2254, 2259 (1975)) (internal quotations omitted). Tennessee Rule of Criminal Procedure 5 provides in pertinent part that "[a]ny person arrested – except upon a capias pursuant to an indictment or presentment – shall be taken without unnecessary delay before the nearest appropriate magistrate . . . ." Tenn. R. Crim. P. 5(a)(1).

Our supreme court has observed, however, that "the issuance of a valid arrest warrant satisfies the requirement that there must be a judicial determination of probable cause for extended detention." State v. Carter, 16 S.W.3d 762, 766 (Tenn. 2000) (citing Baker v. McCollan, 443 U. S. 137, 143, 99 S. Ct. 2689, 2694 (1979)). Chief Deputy Sills testified at the suppression hearing that the defendant was picked up from the Dyer County Jail on a probation violation charge and booked into the Crockett County Jail, where he was held on a $10,000 bond. At trial, he clarified that his March 18 arrest of the defendant was pursuant to a probation violation warrant, which had been signed by the judge on behalf of the probation officer. When reciting the procedural history of the case, the prosecutor informed the court that the defendant had violated his probation in a previous case as a result of a burglary charge to which he had entered a guilty plea in February 2005. We, therefore, agree with the State that there was no Fourth Amendment violation in this case.

Based upon this record, the evidence does not preponderate against the trial court's findings that the defendant's statement was knowingly and voluntarily entered after he had been given adequate Miranda warnings and signed a valid waiver of his right to remain silent or to have an attorney present during questioning. We conclude, therefore, that the trial court did not err in denying the defendant's motions to suppress his statement.

## II. Violation of Sequestration Rule

The defendant next contends that the State failed to meet its burden of showing that he was not prejudiced by the fact that some of the jurors used their cell phones without prior authorization. We respectfully disagree.

"Once a defendant shows that a [sequestered] jury has been separated, the burden shifts to the State to show that such separation did not result in prejudice to the defendant." State v. Jackson, 173 S.W.3d 401, 410 (Tenn. 2005) (citing Gonzales v. State, 593 S.W.2d 288, 291 (Tenn. 1980)). "If the State fails to meet the burden of showing that the separation did not result in prejudice, a new trial is required." State v. Bondurant, 4 S.W.3d 662, 672 (Tenn. 1999).

The record reflects that the trial court instructed the jurors at the beginning of the trial not to make any telephone calls without informing the deputy beforehand that they would be doing so and their intended topic of conversation. After the jury had been charged, defense counsel brought to the court's attention the fact that several of the jurors had been seen talking on their cell phones during a break in the case. Defense counsel then moved for a mistrial on the grounds that the rule of sequestration had been violated. The trial court denied the motion, stating it would not presume that any prejudicial conversations had occurred but would inquire into the situation after the jurors returned their verdicts. In the meantime, the court had the sheriff re-instruct the jurors not to use their cell phones. After the verdicts and sentencing decision were rendered, the trial court inquired as to whether any of the jurors had discussed or received any information about the case during any cell phone conversations. The jurors indicated as a whole that they had not, and the trial court then polled the jury, receiving each juror's assurance that any cell phone conversations that may have occurred concerned only personal or family matters.

We disagree with the defendant's assertion that the jurors' assurances were insufficient to satisfy the State's burden of showing that no prejudice to the defendant occurred. Despite the fact that the cell phone conversations may not have been pre-authorized, each juror assured the court that he or she had not received or imparted any information about the case and that the conversations were unrelated to the trial. We conclude, therefore, that the defendant is not entitled to relief on the basis of this issue.

### III. Unavailability of Witness

The defendant next contends that the trial court erred in ruling that the surviving victim, Lewis Neely, was unavailable at trial. The defendant asserts that he presented proof to show that the victim was physically and mentally capable of traveling to Tennessee and offering testimony at trial, and that the trial court should have therefore issued a capias for his arrest to ensure his compliance with the trial subpoena. The State argues that the trial court properly found Neely unavailable as a witness due to his numerous health problems and the fact that he had previously demonstrated that he was either unable or unwilling to comply with a trial subpoena. We agree with the State.

Under Tennessee Rule of Evidence 804, a witness may be declared unavailable in situations where her or she persists in refusing to testify despite an order of the court to do so; demonstrates a lack of memory; is unable to be present or to testify at the hearing because of death or physical or mental illness or infirmity; or is absent from the hearing and the proponent of the witness's statement has been unable to procure the witness's attendance by process. Tenn. R. Evid. 804(a)(2)-(5). When a witness is declared unavailable, his or her testimony given at another hearing or at a

deposition is admissible as an exception to the rule against hearsay. Tenn. R. Evid. 804(b). This court reviews a trial court's ruling on the unavailability of a witness under an abuse of discretion standard. State v. Summers, 159 S.W.3d 586, 596 (Tenn. Crim. App. 2004); Hicks v. State, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

Lewis Neely, who was living in a Michigan nursing home, did not respond to the first trial subpoena. The trial court granted the defendant's request for an independent medical examination, which found that Neely was "unable to give . . . a history due to aphasia secondary to stroke" and unable to communicate verbally with the nursing home staff. The examining physician concluded, however, that Neely "appear[ed] physically capable of traveling to Tennessee without limitations" but would "require assistance due to his inability to verbalize[.]" At a March 6, 2008, hearing on the matter, however, the State introduced two letters from the victim's attending physician who stated that in his opinion Neely, who had suffered three strokes and also had, among other conditions, diabetes, convulsions, and dementia, was neither physically nor mentally capable of participating in the Tennessee trial.

Defense counsel countered that he had anecdotal evidence that Neely was able to communicate and requested that the trial court grant both a motion for another out-of-state subpoena compelling Neely's attendance at trial and a motion for his deposition. Defense counsel also requested that the court issue a capias for Neely's arrest, suggesting that it would be the responsibility of the sheriff's department to make suitable arrangements for Neely's transport and medical care, such as an ambulance and accompanying medical personnel. The trial court declined to issue the capias, concluding that, based on the information before it, Neely's failure to appear at the first trial date resulted from his physical incapacitation. The court did, however, sign both a certificate for another out-of-state subpoena and the order for a deposition, explaining that if Neely was able to appear at trial, defense counsel would not need the deposition, but in the event he was unable to attend, which the court thought likely, the deposition could be introduced. Neely ultimately failed to appear for trial, and defense counsel introduced his deposition testimony.

We find no abuse of discretion in the trial court's handling of this matter. Neely's physician opined that he was both physically and mentally incapable of testifying at trial, and the defendant's own independent medical expert recognized that he suffered from aphasia and was unable to communicate. Neely's appearance and demeanor in the videotaped deposition were consistent with these opinions. Although he directed his attention to the questioner, he appeared befuddled and disoriented by the proceedings and was largely unresponsive, answering only "Yeah," "No," and "Sir?" to simple questions and staring blankly when asked about the photographic array he had been shown while in the hospital after the shooting. We note that the crucial information defense counsel presumably wanted to elicit from Neely, that he had identified from the photographic array someone unrelated to the case, and had not identified the defendant, was brought out at trial through the testimony of Chief Deputy Sills. In addition, as the State points out, the trial court permitted defense counsel to argue to the jury that Neely's live testimony would have been better than his deposition because the jurors could have made their own determinations as to his mental capacity. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

# IV. Prior Bad Act Evidence

The defendant next contends that the trial court erred in denying his motion in limine to exclude prior bad act evidence of the defendant and his companions. Specifically, he complains that the trial court should not have allowed the jury to hear the portion of his statement in which he related how he, Spivey, and Taylor had attempted to rob the victims on the night preceding the murder. The State argues that the trial court properly admitted the evidence because it was relevant to show the defendant's intent and "completed the story" for the jury. We agree with the State.

Tennessee Rule of Evidence 404(b), provides as follows:

> Other Crimes, Wrongs, or Acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:
>
> (1) The court upon request must hold a hearing outside the jury's presence;
>
> (2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;
>
> (3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and
>
> (4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Exceptional cases in which evidence of an accused's prior bad acts will be admissible include those in which the evidence is introduced to prove identity, intent, motive, opportunity, or rebuttal of mistake or accident. State v. Drinkard, 909 S.W.2d 13, 16 (Tenn. Crim. App. 1995). Such evidence may also be admitted in order to complete the story of the crime for which the accused is on trial. See Neil P. Cohen et al., Tennessee Law of Evidence § 4.04[13] (5th ed. 2005). Where the trial judge has substantially complied with procedural requirements, the standard of review is abuse of discretion. State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

The defendant began his account of the crimes by telling the officers that he, Spivey, and Taylor had gone to the victims' home on the night preceding the murder and that Taylor had entered the house with a shotgun hidden in his pants leg but had been "run off" by the victims. The defendant said that when he and his companions were discussing the failed robbery with their girlfriends, the defendant's girlfriend told them how the robbery should be committed, suggesting that the defendant go to the home under the pretense of wanting to buy some liquor from the victims.

The defendant stated that Taylor recruited Bricco to help because he was known to have access to a pistol and that the shooting began when Lewis Neely recognized Taylor from the previous night's aborted robbery attempt and ran to get his own gun.

After listening to the arguments of counsel in a pretrial hearing, the trial court ruled that evidence of the previous night's robbery attempt was admissible, stating, in pertinent part: " I think it does complete the story and I think that the other comments the General made [that the evidence showed the defendant's intent and premeditation] are generally in line with what the Court feels on that matter."

The trial court did not make the requisite findings for the admission of evidence under Rule 404(b). Regardless, we agree with the trial court that the evidence was relevant to show the defendant's intent and motive and to complete the story of the offenses for the jury. Furthermore, in our view, the prejudicial impact of such evidence did not outweigh its strong probative value. We conclude, therefore, that the trial court did not err in admitting the evidence.

## V. Improper Opinion Evidence

As his final issue, the defendant contends that the trial court erred by allowing Sheriff Troy Klyce to offer improper opinion evidence about the possible source of a scar he observed on the defendant's hand. The State argues that the evidence was properly admitted lay testimony relevant to an issue at trial and based on the officer's own personal experience.

Sheriff Klyce testified that he observed a scar or old wound on the defendant's left hand between his thumb and index finger while he was taking the defendant's March 21, 2005 statement. After stating that he was familiar with semi-automatic pistols, Sheriff Klyce described the sliding mechanism by which such pistols eject a shell after each shot and testified that he had once been injured while firing a semi-automatic weapon when the slide on the pistol cut his hand between the index finger and thumb. Over the defendant's objection, the prosecutor asked the sheriff if the scar he had observed on the defendant's hand was consistent with the scar he had received from firing the semi-automatic weapon. In response, the sheriff replied that it was located in the same place.

Tennessee Rule of Evidence 701 provides:

If a witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are

(1) rationally based on the perception of the witness and

(2) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue.

We agree with the State that Sheriff Klyce's testimony, to the effect that the defendant had a wound located in the same place as a wound he had received from firing a semi-automatic weapon, was rationally based on his own experience and perception. We conclude, therefore, that the defendant is not entitled to relief on the basis of this claim.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court but remand for entry of a corrected judgment to reflect that the defendant received a life sentence for his first degree murder conviction.

_____

ALAN E. GLENN, JUDGE