# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs October 5, 2010

## STATE OF TENNESSEE v. BOBBY JACKSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 08-00127   W. Otis Higgs, Judge**

---

**No. W2009-02232-CCA-R3-CD  - Filed May 11, 2011**

---

A Shelby County jury convicted the defendant, Bobby Jackson, of first degree murder in the perpetration of a robbery and especially aggravated robbery, a Class A felony. The trial court sentenced him to life imprisonment for the first degree murder conviction and to twenty years for the especially aggravated robbery conviction, to be served concurrently in the Tennessee Department of Correction. On appeal, the defendant argues that the evidence was insufficient to sustain his convictions, that the trial court erred by admitting into evidence the videotaped preliminary hearing testimony of an allegedly unavailable witness, that the trial court erred by allowing the jury to view the videotaped testimony in the jury room during deliberations, and that the trial court erred by admitting into evidence a letter purportedly written by the defendant. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

J.C. MCLIN, J., delivered the opinion of the court, in which ALAN E. GLENN and CAMILLE R. MCMULLEN, JJ., joined.

Laurie W. Hall, (on appeal and at trial), Memphis, Tennessee; and Juni Ganguli (at trial), Memphis, Tennessee, for the appellant, Bobby Jackson.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; William L. Gibbons, District Attorney General; and Colin Campbell and Chris Scruggs, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Background

On January 10, 2008, a Shelby County grand jury indicted the defendant, Bobby Jackson, and his co-defendant, David Hamilton, for first degree murder in the perpetration of a robbery and especially aggravated robbery, a Class A felony. The court severed their trials, and the defendant proceeded to trial on July 6, 2009.

Aurelia Guillen testified that in January 2007, she lived in Memphis, Tennessee, and was separated from the victim, Carlos Guillen, with whom she had two children. She said that the last time she saw the victim was December 31, 2006, when he picked up their children from her house. Guillen testified that the victim owned a Chevrolet Trailblazer.

Jose Leon testified that the Shelby County District Attorney's office employed him as a victim witness coordinator for the Hispanic community. He said that he met Martin Sanchez, a witness in this case, at the preliminary hearing in 2007. At that time, Sanchez gave Leon his local contact information and informed Leon that he planned to return to Mexico. Leon said that Sanchez gave him the number to a phone booth in his village in Mexico. Leon testified that he attempted to locate Sanchez through the local contact information and through the Mexican phone number but was unsuccessful in finding him before trial.

Detective Ronald Goodwin testified that he was a criminal investigator for the Shelby County District Attorney's office. He said that he attempted to locate Sanchez using the information from his statement to police, utility company records, motor vehicle records, and his wife's records. Detective Goodwin said that he went to the local address he found, but no one at that location knew where Sanchez had gone. Detective Goodwin stated that he used a nationwide database to determine whether any agency had arrested Sanchez or his wife, but the search did not reveal any arrests.

On cross-examination, Detective Goodwin testified that he was unaware of whether federal authorities had issued a visa or work permit for Sanchez.

The state played the videotape of Sanchez's testimony from the defendant's preliminary hearing. On direct examination, Sanchez testified that on January 5, 2007, he was in the parking lot of the Willow Oaks Apartments when the victim asked whether he wanted to purchase any CDs. Sanchez said that after he purchased a CD and received change from the victim, two black men approached the victim's vehicle. He said that one man was taller than the other, and the taller man told the victim to get out of the vehicle. The taller man pulled the victim out of the vehicle and pointed a gun at him. The shorter man hit the victim, and the victim fell to the ground. When the victim tried to get up, the taller man shot him. The men drove away in the victim's vehicle. Sanchez testified during cross-examination that he was twenty meters away from the vehicle and could see and hear

everything clearly. He said that police showed him photographs, but he did not identify either of the two suspects from the photographs.

Memphis Police Officer David Reed testified that on January 5, 2007, he responded to a shooting at 2749 Ketchum Road in the Willow Oaks apartment complex. When he arrived, he found a male Hispanic laying on the ground. Officer Reed testified that he took witness reports and held the scene until detectives arrived.

Memphis Police Sergeant Alisa Mitchell testified that in January 2007, she was a crime scene investigator. She said that on January 5, 2007, she made the scene at 2749 Ketchum Road and observed that the victim was lying on his back with his arms above his head. She recalled that he had a gunshot wound to the chest. Sergeant Mitchell testified that she photographed the scene and collected three nine millimeter Luger Winchester shell casings.

On cross-examination, Sergeant Mitchell testified that the victim was carrying a wallet with $44 inside. She said that she collected the wallet as part of the victim's personal belongings.

On re-direct examination, Sergeant Mitchell testified that she did not recover the victim's keys at the scene.

Tracy Rivers testified that she lived in the Willow Oaks apartment complex. She said that on January 5, 2007, she was walking through the apartment complex with her fourteen-year-old cousin when two young black males tried to speak to her cousin. Rivers said that she had never seen the males before that day. She stated that the males were between sixteen and nineteen years old and that one was taller than the other. Rivers testified that she had just walked into her apartment approximately five minutes after encountering the males when she heard three gunshots. Rivers said that she looked out of the door and saw a "bluish greenish truck speed out." She also described the vehicle as a jeep.

On cross-examination, Rivers testified that she was unable to identify the two males in a photospread shown to her by police on January 7, 2007.

Memphis Police Officer Randall Davis testified that on January 6, 2007, he was patrolling his precinct when he observed a blue Chevrolet SUV parked in the driveway of an empty house. He ran the vehicle identification number on his computer, which indicated that the vehicle was stolen. Officer Davis recalled that a white cross was hanging from the rearview mirror. He said that the police department towed the vehicle to the investigative

hold unit. The parties stipulated that the 2002 Chevrolet Trailblazer was registered to the victim.

Varreous Thomas testified that he was the co-defendant's brother. He said that on January 5, 2007, he was with the defendant at the Hillview Apartments, and he heard the defendant say that he had shot someone. Thomas stated that he saw a blue Chevrolet Trailblazer that day on Alcy Road behind an abandoned house, which was a five minute walk from the Hillview Apartments. He said that he had not seen the defendant with that vehicle before that day. Thomas agreed that he told police that the defendant had some keys that Thomas believed were for the Trailblazer, but he said that he was "under pressure" when he said that.

On cross-examination, Thomas testified that the defendant never told him anything about a Trailblazer.

Officer Vivian Massey testified that she was a corrections officer at 201 Poplar Avenue. She said that on June 9, 2009, Officer Tyrone Mourning gave her a letter, which she in turn gave to her lieutenant. She recognized Exhibit 22 as the letter that Officer Mourning gave her.

Officer Mourning testified that he was a corrections officer at 201 Poplar Avenue. He said that on June 9, 2009, the defendant gave him a letter, which he identified as Exhibit 22, to give to David Hamilton, the co-defendant. Officer Mourning stated that he gave the letter to Officer Massey.

The state read the letter into evidence, paraphrasing at times. The full letter read as follows:

> What's up lil bro. You straight down their [sic]. [L]ook I been hearing you suppost [sic] to be testyfing [sic] against me. Why you wanna do that bro. So you want me to spend the rest of my life [in] jail from my 3 kids. You know I [expletive] with you bro like a lil brother but why you want to get both of our life [sic] [expletive] off. Cause both of us gone do some time regardless. We were together lil Dave bro. [T]he reason they want you to testyfied [sic] is because they don't have the shooter[.] [I]f they don't got [sic] that[,] they don't have [expletive] on us[,] meaning they don't got [sic] no case. Why you think we been [sic] here so long bro. [I]f you don't testyfied [sic] we go home. [Expletive] you said you ready [sic] to go home right. Well let's make this [expletive] happen. You need to get in that law work bro [and] stop fighting [expletive] cause that type of [expletive] make you look bad in

-4-

court. I go to trial July 6. I don't want you to testyfied [sic] against me bro, cause I want to go home to [sic]. We both need our freedom. [T]hen look if both of us get charge[d] it's gone [sic] get broke down to [i]nvoluntary manslaughter. [I]f you look in your law work you will see that [i]nvoluntary manslaughter is a homicide committed under such circumstances that it plainly appears that neither death nor bodily harm was intended by the party doing the killing, but that death was accidentally caused by some unlawful act, or by some act not strictly unlawful in itself, but done in an unlawful manner and without due caution and that death was natural and probable result of such act. So [r]emember I told them that we got into a fight of the gun [and] it went off[,] but at the same time we tried to robb [sic] that man to [sic]. So we still gone [sic] have to do some time bro. So are you shure [sic] you want to testyfied [sic]. [I]f so you must gone [sic] take the Especially [sic] Aggravated robbery. [N]ow that goes back when I said we were together[.] I can't take both of the charges bro real talk. We need to fight this [expletive] together. Once again[,] no shooter, no case, don't never [sic] forget that bro. [I]f you don't listen to [nobody] else listen to me because I'm reading on this [expletive]. Don't testyfied [sic] lil Dave. I love you bro. [R]eal talk even though I talk bad about you[,] but I still [expletive] with you because you my young [expletive] [and] you don't understand this [expletive]. [B]ut we can beat these people.

[Signed] Murder Man A.K.A. get down or laydown B.K.A. lil Bobby
To lil Dave

On cross-examination, Officer Mourning stated that he did not recall the exact date in June when the defendant gave him the letter nor what time of day it was. He said that he was not familiar with the defendant's handwriting and did not see the defendant write the letter. He agreed that the defendant had a cell mate.

Francis Donald Carpenter testified that he was retired from the Memphis Police Department, where he was a crime scene and fingerprint technician. He testified that he processed fingerprints from a coffee cup found inside the victim's vehicle and from the vehicle itself. The parties stipulated that the fingerprints matched the victim's.

Tennessee Bureau of Investigation Special Agent Cervinia Braswell testified that she was a forensic scientist in the firearms identification unit. She said that the Memphis Police Department provided her with a bullet, three nine millimeter cartridge cases, a box of Winchester .380 caliber ammunition, a Cobra .380 automatic pistol, and seven other Winchester .380 caliber cartridges. Agent Braswell testified that the three nine millimeter

-5-

cartridges were fired from the same weapon. She said that the .380 pistol would not have been able to fire nine millimeter bullets. Agent Braswell said that the bullet provided to her was a nine millimeter.

Memphis Police Sergeant Anthony Mullins testified that he interviewed Varreous Thomas in connection with this case. According to Sergeant Mullins, the robbery bureau was interviewing Thomas about several cases when he indicated that he had information about a homicide. Thomas agreed to speak with homicide detectives and gave a witness statement. Sergeant Mullins said that Thomas told him that the defendant had told him that he shot the victim after Thomas saw a blue Trailblazer on Alcy Road. Thomas identified a picture of the victim's Trailblazer as the vehicle he saw. Thomas told him that he went to the Trailblazer with Jeffrey Turner, who took some CDs out of the vehicle. Thomas said that the defendant had a set of keys with "a little thing hanging on them" that had "Mexican words" written on it. Thomas assumed the keys belonged to the Trailblazer because the vehicle's steering column was not broken and because the defendant did not own a vehicle.

Sergeant Mullins further testified that he interviewed the defendant on February12, 2007, because Thomas's statement and another witness's statement implicated the defendant. In the defendant's written statement, the defendant admitted that he was responsible for the victim's death. He said that he fired one or two shots from a nine millimeter. The defendant said that "Dave" was with him and was armed with a .22 caliber weapon but did not fire any shots. The defendant stated that he shot the victim because the victim tried to take his gun. The defendant said that he got the nine millimeter from a person named Octavious, and he returned the gun to Octavious after shooting the victim. He said that Dave drove the Trailblazer away from the scene, and the defendant later drove it to a location near his house on Sugar Creek Road. Sergeant Mullins testified that, at the time that the police booked the defendant and his co-defendant into the jail, the defendant was two inches taller and fifty pounds heavier than his co-defendant.

On cross-examination, Sergeant Mullins testified that Thomas initially told him that the defendant did not tell him anything about his involvement. He further testified that he knew that the defendant was a juvenile at the time of his interview and that his mother was in Memphis. He agreed that he did not contact the defendant's mother. Sergeant Mullins said that the defendant indicated that he had completed the tenth grade and had been in special education classes. Sergeant Mullins stated that the defendant initially did not understand his rights, so Sergeant Mullins and his partner "went over each of his rights with him."

On re-direct examination, Sergeant Mullins testified that the defendant was in custody in the Shelby County Jail rather than in the juvenile system; therefore, he treated the

defendant as an adult. Sergeant Mullins said, "[A]pparently he had been involved in so many encounters with the law that the juvenile system felt there was nothing they could do to rehabilitate him or anything else."

Dr. Lisa Funte, an assistant medical examiner, testified that the victim died from a gunshot wound to his chest. She further testified that stippling around the entrance wound indicated that the muzzle of the gun was "within a few inches to a few feet."

Following the close of proof and deliberations, the jury found the defendant guilty of first degree murder in the perpetration of a felony and especially aggravated robbery, a Class A felony. The trial court sentenced the defendant to life for the first degree murder conviction and to a concurrent twenty-year sentence for especially aggravated robbery, to be served in the Tennessee Department of Correction.

**Analysis**

I. Sufficiency of the Evidence

For his first argument, the defendant claims that the evidence was insufficient to sustain his convictions. Our review begins with the well-established rule that once a jury finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the jury's verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the jury's verdict approved by the trial judge accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude every other hypothesis except that of guilt. *See State v. Genaro Dorantes*, 331 S.W. 3d 370 (Tenn. 2011) (adopting the United States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

Relevant to this case, felony murder is the killing of another committed in the perpetration of or attempted perpetration of a robbery. Tenn. Code Ann. § 39-13-202(a)(2). A murder qualifies as felony murder if the underlying felony is closely connected to the killing in time, place, causation, and continuity of action. *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000). Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the jury after consideration of all the facts and circumstances. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). To sustain a conviction for especially aggravated robbery, the evidence must establish that the defendant robbed the victim with a deadly weapon and the victim suffered serious bodily injury. *Id.* § 39-13-403(a).

In this case, the evidence, taken in the light most favorable to the state, established that the defendant and his co-defendant approached the victim with the intention of taking the victim's vehicle. When the victim did not comply with the defendant's demands to get out of his car, the defendant pulled him out and shot him. The defendant and co-defendant then drove away in the victim's vehicle, which was later recovered by police. The defendant admitted his involvement in his statement to police. Sanchez's preliminary hearing testimony and the defendant's attempted correspondence with his co-defendant corroborated his confession, and Thomas's testimony further linked the defendant to the victim's vehicle and to the shooting. Accordingly, based upon the evidence presented, we conclude that the jury could find the defendant guilty of the offenses of felony murder and especially aggravated robbery beyond a reasonable doubt.

## II. Unavailability of Witness

The defendant contends that the trial court erred by admitting the videotape of Sanchez's preliminary hearing testimony. Specifically, the defendant argues that the state did not make a good faith effort to obtain Sanchez's presence for trial. Additionally, the defendant claims that the testimony did not carry an indicia of reliability because a different attorney cross-examined Sanchez than represented the defendant at trial and because the videotape was difficult to hear.

Tennessee Rule of Evidence 804 allows for hearsay testimony of a declarant who is unavailable at trial if the testimony:

> [was] given as a witness at another hearing of the same or a different proceeding or in a deposition taken in compliance with law in the course of the same or another proceeding, if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination.

Tenn. R. Evid. 804(b)(1). Before such testimony will be admitted, however, the proponent must establish that the witness "[i]s absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance by process." Tenn. R. Evid. 804(a)(5). Further, in cases such as the one at bar it must be shown that the declarant is truly unavailable after good faith efforts to obtain his presence. *See Barber v. Page*, 390 U.S. 719, 724-725 (1968); *see also State v. Arnold*, 719 S.W.2d 543, 548 (Tenn. Crim. App. 1986) (citations omitted). The United States Supreme Court stated that "good faith" is defined as "[t]he lengths to which the prosecution must go to produce a witness . . . [and] is a question of reasonableness." *Ohio v. Roberts*, 448 U.S. 56, 74 (1980), *abrogated by Crawford v. Washington*, 541 U.S. 36 (2004). "The ultimate question is whether the witness is unavailable despite good-faith efforts undertaken prior to trial to locate and present that witness. As with other evidentiary proponents, the prosecution bears the burden of establishing this predicate." *Id.* at 74-75. We will uphold the trial court's determination that a witness is available or unavailable absent an abuse of discretion. *See Hicks v. State*, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972).

In this case, we conclude that the trial court did not abuse its discretion by finding that Sanchez was unavailable to testify and by admitting his preliminary hearing testimony into evidence. The state presented two witnesses to testify as to the state's efforts to find Sanchez. Leon testified that Sanchez planned to return to Mexico, and Leon attempted to locate him in Mexico by calling the number Sanchez gave him. Detective Goodwin testified that he went to the local address that Sanchez had provided and no one knew where Sanchez had gone. Detective Goodwin searched for Sanchez through the resources he had to no avail. Therefore, we conclude that the state made a good faith effort to find Sanchez. Concerning

the admission of Sanchez's preliminary hearing testimony, the defendant's counsel, while not the same attorney who represented him at trial, had "both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination" in "another hearing of the same . . . proceeding." Tenn. R. Evid. 804(b)(1). Therefore, as Sanchez was unavailable, his testimony at the preliminary hearing met the former testimony exception to the hearsay rule. The defendant is without relief as to this issue.

### III. Viewing of Videotaped Testimony During Deliberations

The defendant argues that the trial court erred by allowing the jury to review the videotape of Sanchez's preliminary hearing testimony during deliberations. It is unclear, based on the defendant's brief and the record, whether the defendant is contending that the videotaped preliminary hearing testimony was akin to a deposition, which Tennessee Rule of Criminal Procedure 30.01 bars from the jury room, or was evidence that the trial judge, for good cause, should have excluded from the jury room as inappropriate because the videotape contained other testimony not admitted as evidence. The state responds that the defendant has waived this issue by failing to timely object, and we agree.

Tennessee Rule of Appellate Procedure 36(a) states, "Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error." "Indeed, it is well-settled that a litigant 'will not be permitted to take advantage of errors which he himself committed, or invited, or induced the trial court to commit, or which were the natural consequence of his own neglect or misconduct.'" *State v. Robinson*, 146 S.W.3d 469, 493 (Tenn. 2004) (quoting *Norris v. Richards*, 246 S.W.2d 81, 85 (1952)); *see also State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000); Tenn. R. App. P. 36(a).

The trial court told the jury, after the state showed the videotape during the trial, that the jury would be able to view it in the jury room during deliberations, and the defendant did not object. After the jury retired for deliberations, the defendant objected and requested that the jury view the videotape in the courtroom under the court's supervision. The trial court agreed and brought the jury into the courtroom to explain that they would watch the videotape in the courtroom rather than in the jury room. The jury foreperson informed the court that they had already watched the video and that they only watched Sanchez's testimony.[1] Had the defendant made a timely objection rather than waiting until the jury had begun deliberations, this issue would have been moot because the trial court ultimately ruled in the defendant's favor. In any event, any error on the part of the trial court was harmless in light of the record as a whole. When undertaking a harmless error analysis, this court must consider whether "an error more probably than not had a substantial and injurious impact on

---

[1] The videotape also contained other testimony from the preliminary hearing.

-10-

the jury's decision-making." *State v. Rodriquez*, 254 S.W.3d 361, 372 (Tenn. 2008). In this case, the jury only reviewed the part of the videotape that the state had shown during the trial, and we cannot say that viewing the videotape in the jury room rather than in the courtroom had a substantial and injurious impact on the jury's decision-making. Therefore, the defendant's argument is without merit.

### IV. Admissibility of Letter

The defendant challenges the trial court's admission of the letter purportedly written by the defendant on two grounds. First, he claims that the state did not properly authenticate the letter by establishing an unbroken chain of custody or by identifying the handwriting as the defendant's. Secondly, he claims that the letter was unduly prejudicial because of the use of the nickname "Murder Man." The state responds that it sufficiently established the chain of custody and that the defendant waived the second argument by not presenting it below.

Before tangible evidence can be admitted into evidence, a witness must be able to identify the evidence or establish an unbroken chain of custody. *State v. Scott*, 33 S.W.3d 746, 760 (Tenn. 2000). While every possibility of tampering does not have to be excluded, the circumstances must establish a reasonable assurance of the identity and integrity of the evidence. *Id.* The chain of custody requirement is "'to demonstrate that there has been no tampering, loss, substitution, or mistake with respect to the evidence.'" *Id.* (quoting *State v. Braden*, 867 S.W.2d 750, 759 (Tenn. Crim. App. 1993)). It is in the sound discretion of the trial court to determine whether the chain of custody requirement has been satisfied, and the trial court's determination will not be overturned in the absence of clearly mistaken exercise of that discretion. *See Scott*, 33 S.W.3d at 752 (citing *State v. Holbrooks*, 983 S.W.2d 697, 701 (Tenn. Crim. App. 1998)).

Officer Mourning testified that the defendant gave him a letter to pass to his co-defendant. Officer Mourning could not remember the exact time or date, but he recalled that he read the letter and gave it to Officer Massey because of its contents. Officer Mourning identified the letter introduced into evidence as the same letter given to him by the defendant. Officer Massey, likewise, identified the letter introduced into evidence as the same letter that Officer Mourning gave to her. We note that prior to trial, the state could not locate the original letter and sought to introduce a copy, but by the time of trial, the state found the original letter, which Officer Mourning and Officer Massey identified. We conclude that the officers' testimonies sufficiently established the identity and integrity of the evidence, and the trial court did not abuse its discretion by admitting it.

As for the defendant's second argument regarding the use of the nickname "Murder Man," we agree with the state that the defendant waived the issue by not objecting prior to trial when the court had a hearing on the state's motion in limine nor during trial when the

state read the letter into evidence. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. *State v. Schmeiderer*, 319 S.W.3d 607, 625 (Tenn. 2010) (citing *State v. Alder*, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001)). Therefore, the defendant has waived this argument and is without relief as to this issue.

## Conclusion

Based on the foregoing reasoning, we affirm the judgments of the trial court.

_____
J.C. McLIN, JUDGE