IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 25, 2020 Session

**STATE OF TENNESSEE v. JUSTIN L. KISER**

**Appeal from the Criminal Court for Union County**
**No. 5231      E. Shayne Sexton, Judge**

**No. E2019-01296-CCA-R3-CD**

The Defendant, Justin L. Kiser, was convicted by a Union County Criminal Court jury of five counts of especially aggravated kidnapping, a Class A felony. *See* T.C.A. § 39-13-305 (2018). On appeal, the Defendant contends that (1) the evidence is insufficient to support his convictions; (2) the trial court erred by not requiring the State to show its good faith efforts to locate a missing witness before declaring that witness unavailable for trial; and (3) the trial court erred by sentencing the Defendant to twenty-one years' confinement. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Forrest L. Wallace (at motion for new trial hearing and on appeal) and Andrew Crawford (at trial), Knoxville, Tennessee, for the appellant, Justin L. Kiser.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Jared Effler, District Attorney General; and Tyler Hurst and Ronald Laffitte, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

A Union County grand jury indicted the Defendant for five counts of especially aggravated kidnapping related to a home invasion during which five victims were confined against their will at gunpoint by two masked men. One of the perpetrators, later identified as John Teague, was shot and killed during the incident by one of the victims.

At the March 27, 2018 trial, Anthony Glenn testified that in July 2016, he lived with Amy Boles, his ex-girlfriend; John Glenn, his brother; Cherry Johnson, John

Glenn's girlfriend; and Kathy Helton, his grandmother. Mr. Glenn said that Tyler Barr and one of Mr. Barr's friends, who was later identified as Cody Cheshire, also stayed in the home for two nights. Mr. Glenn recalled that on July 28, 2016, he had gone to bed and was awakened by Ms. Boles's telling him she heard screaming. He stated that he got dressed and went into the living room where he saw a man wearing a clown mask and another man holding a shotgun standing in his brother John's bedroom. Mr. Glenn explained that the man in his brother's bedroom holding the shotgun was initially wearing a mask, but the man removed it. He stated that he did not recognize the man holding the shotgun. He said that the man in his brother's bedroom told Mr. Glenn to get on his knees. He stated that Ms. Boles and Ms. Helton came into the living room and that Mr. Barr and Mr. Cheshire were sitting on a couch in the living room with their hands raised. Mr. Glenn explained that while the man holding the shotgun forced him to his knees, the man in the clown mask silently waved a pistol around the room and pointed it at him. Mr. Glenn said that the man in the clown mask wore dark clothing, that the mask had a white face with red hair, and that the mask completely covered the man's face and hair.

Mr. Glenn testified that he told Ms. Boles and Ms. Helton to leave the living room because they were being robbed. He explained that after he said this, the man with the shotgun told him to get back on his knees or he would kill him. He said that the man and his brother John began fighting for control of the shotgun. He explained he got off his knees to help his brother, that he tackled the man with the shotgun, and that the man released the shotgun. Mr. Glenn stated that his brother grabbed the shotgun, that the man "charg[ed] at" Mr. Glenn and his brother, and that his brother shot the man. Mr. Glenn recalled that he told the man in the clown mask to leave and that the man left. He said the police were called.

Mr. Glenn testified that he had known the Defendant for a long time because they had gone to school together. He said that he used drugs with the Defendant at the Defendant's house. Mr. Glenn stated that the Defendant purchased drugs from his brother at the home where he and his brother resided. He said that the last time he was with the Defendant was two weeks prior to the incident.

On cross-examination, Mr. Glenn testified that the person in the clown mask had every part of his body completely covered, including his hands, and stated that the person in the clown mask never uttered a word and could have been a man or a woman.

Crystal Williams was listed as a State witness but was unavailable for trial. The following testimony from the preliminary hearing in the general sessions court was read to the jury. Ms. Williams testified that James Teague was her boyfriend and that the Defendant worked with Mr. Teague. Ms. Williams said that she had known the Defendant for approximately four or five years. Ms. Williams explained that she and Mr. Teague were staying at the Defendant's home the week before the incident. Ms.

Williams said while she and Mr. Teague were staying with the Defendant, they drove him to a nearby home where the Defendant purchased a $10 bag of methamphetamine. Ms. Williams said that Mr. Teague and the Defendant did not work during the week she and Mr. Teague stayed with the Defendant. She explained that Mr. Teague and the Defendant discussed different work opportunities and their need to make money.

Ms. Williams testified that the Defendant told her he had a plan to obtain money. She said that on July 28, 2016, the Defendant left his home driving a "bright yellow" four-wheeler. Ms. Williams stated that the Defendant left around 1:00 or 2:00 a.m. and did not return until approximately 7:00 a.m. Ms. Williams said that when the Defendant left, he was not intoxicated but that when he returned, he was "a little bit tipsy," wearing a clown mask and carrying a shotgun and a pistol. Ms. Williams explained that the Defendant had previously worn the clown mask in order to scare her dog. She described the mask as one that covered the Defendant's entire head and had red hair and a white face. Ms. Williams said the mask was "real scary, like gory, bloody."

Ms. Williams testified that on July 27, 2016, the Defendant had revealed to her that he intended to rob the people who sold him the methamphetamine. Ms. Williams said that Mr. Teague attempted to persuade the Defendant to abandon his plan to commit a robbery but that the Defendant insisted on carrying out the robbery to obtain money quickly. Ms. Williams said that the Defendant and Mr. Teague had these discussions around 10:00 p.m. on the Defendant's front porch. Ms. Williams said that at approximately 2:00 a.m. on July 28, 2019, she went outside and realized the Defendant and Mr. Teague were no longer home. Ms. Williams said that the she next saw the Defendant when he returned. Ms. Williams stated that when he came inside, he was "shaken up" and "could hardly breathe." Ms. Williams asked about Mr. Teague's whereabouts, but the Defendant said he did not know. Ms. Williams said that she and the Defendant got in his car to look for Mr. Teague, that they saw blue lights shortly after leaving, and that the Defendant drove them back to his home. Ms. Williams said the Defendant was "freaking out." Ms. Williams repeatedly asked what had happened to Mr. Teague, but the Defendant only told her that he and Mr. Teague left the other home at the same time. Ms. Williams said that the police were at this home and explained that this was the home of the people that the Defendant had planned to rob. Ms. Williams said that the Defendant gave her $7, and that he asked her to leave his home because her car was registered to Mr. Teague, and that she gathered her belongings and left. Ms. Williams explained that before she left the Defendant's home, the Defendant instructed her not to tell anyone about what had happened.

Ms. Williams testified that after she left the Defendant's home, she picked up her niece. Ms. Williams said that she and her niece drove back to the home surrounded by police because she wanted to find out what happened to Mr. Teague. As she approached the home, Ms. Williams saw two young boys walking down the street. Ms. Williams stated that she stopped her car and asked the boys what had happened and that the boys

told her that someone attempted to commit a robbery and was shot and killed in the process. Ms. Williams said that at that point, she understood Mr. Teague was dead and that she returned to the Defendant's home to collect her belongings. Ms. Williams explained that when she arrived at the Defendant's home, the Defendant was not there. She said that the Defendant's father helped her gather her belongings, that she left, and that she had not seen the Defendant since that day. Ms. Williams identified a photograph of the shotgun the Defendant had in his possession on the morning of the incident, which was received as an exhibit.

Christian Tyler Barr testified that on July 28, 2016, he was staying at the home at which the incident occurred. Mr. Barr said that he slept on one end of an L-shaped couch located in the living room and that Mr. Cheshire slept on the other end of the couch. He explained that during the night "the breaker shut off," and he went outside and flipped the breaker. Mr. Barr said that he thought he heard something outside, and he awoke Mr. Cheshire. He stated that the two of them sat outside for a while but did not hear anything. Mr. Barr said he and Mr. Cheshire went back inside but before they went to sleep, Mr. Barr heard the screen door of the home move. He said this was around 2:00 or 3:00 a.m. and that he and Mr. Cheshire went back to sleep. Mr. Barr stated that approximately twenty minutes later, he was awakened by being hit with a gun. Mr. Barr said he saw a man standing over him, swatted the gun away, jumped up, and saw a man with a gun standing at the door. Mr. Barr explained that when he shoved the gun away, he noticed it was a shotgun. Mr. Barr said that the man who hit Mr. Barr with the gun ran into a bedroom.

Mr. Barr testified that there was a second man standing near the doorway in the living room. Mr. Barr said that the man was dressed in all black and wore "the craziest clown mask I had ever seen." Mr. Barr explained that the mask completely covered the man's head and had "spiked" red hair and blood running down a white face. Mr. Barr said that this man held a pistol and pointed it at him and the others on the couch. Mr. Barr said that he spoke to the man in the clown mask and said to the man that "[he] didn't want to do this" and would likely go to prison. Mr. Barr stated that the man in the clown mask never spoke.

Mr. Barr said that the man who hit him with the shotgun kicked John Glenn's bedroom door and yelled at the bedroom occupants. Mr. Barr said that the man screamed that he wanted the money and the drugs. Mr. Barr said that the rest of John Glenn's family came into the living room and that they were crying. The man in the clown mask attempted to calm them all by using hand motions. Mr. Barr said that he heard sounds of a "tussle" in John Glenn's bedroom and that Ms. Johnson left the bedroom through an attached bathroom and entered the living room. Mr. Barr said that after hearing sounds of a struggle from the bedroom, Anthony Glenn ran into the bedroom. Mr. Barr stated he heard more sounds of a struggle and then a gunshot. Mr. Barr said that after the gunshot,

the man in the clown mask left the home. Mr. Barr said that Mr. Cheshire was sitting on the couch during the incident.

Cherry Johnson testified that on July 28, 2016, she lived with her boyfriend, John Glenn; John Glenn's grandmother; Anthony Glenn; and Amy Boles. Ms. Johnson said that while she was sleeping, a man kicked in her bedroom door. She said that this man had on a mask and gloves, which he eventually removed, and observed that the man was an "older guy" with a "scruffy" beard. Ms. Johnson said that after the man kicked in her bedroom door, he began screaming. Ms. Johnson explained that she left her bedroom through a connected bathroom door, which led into the kitchen. Ms. Johnson said that she left the kitchen and entered the living room, where she saw a tall man wearing a clown mask. Ms. Johnson said that the mask had a red hair, a scary white face, and was red around the mouth. Ms. Johnson said that the man pointed a pistol at her and shook his head "no." Ms. Johnson stated she stopped walking and put her hands up in the air. Ms. Johnson said that she was attempting to retrieve a bat when the man in the clown mask pointed the pistol at her. Ms. Johnson stated that she did not think she could get the bat or leave the house.

Ms. Johnson testified that when the man in her bedroom realized that she was no longer there, he stood in her bedroom doorway, pointed his shotgun at her, and instructed her to return to her bedroom and give him "everything I had." Ms. Johnson said she went into her bedroom and began emptying her drawers to show the man that she did not have anything worth stealing. Ms. Johnson stated that she believed the man was looking for "dope or money." She explained that if there had been any money or drugs in the home, they would have been in her bedroom.

Ms. Johnson said that Anthony Glenn was on his knees in the living room while the man in the clown mask pointed the pistol at him. Ms. Johnson said that Anthony Glenn told the man in the clown mask the man would "have to shoot him." Ms. Johnson explained that Anthony Glenn got up, ran into her bedroom, and attempted to help John Glenn, who was wrestling with the other man. Ms. Johnson explained that John Glenn was able to take the shotgun from the man, that John Glenn warned the man to leave, that the man told the man in the clown mask to "start killing everybody," and that John Glenn shot the man.

Ms. Johnson testified that she did not know the man who was shot. Ms. Johnson said that she knew the Defendant from school and that he was a friend of Anthony and John Glenn. Ms. Johnson explained that the Defendant had been at the home to purchase "dope" approximately two or three days before the incident.

Kathy Helton testified that on July 28, 2016, she lived with her grandsons, John Glenn and Anthony Glenn; Amy Boles; and Cherry Johnson. Ms. Helton stated that on July 28, 2016, two men broke into their home and awakened her. Ms. Helton testified

that she heard a gunshot and left her bedroom. Ms. Helton entered the living room where she observed a man standing in the doorway, holding a silver and black pistol, and wearing a clown mask. She explained that the mask had red hair and a scary face. Ms. Helton stated that when she entered the living room, the man in the clown mask pointed the pistol at her and ran out of the home. Ms. Helton said that Tyler Barr, Mr. Cheshire, and Anthony Glenn were also in the living room. Ms. Helton explained that while the man in the clown mask pointed the pistol at her, she did not feel free to leave the home.

Ms. Helton testified that she never saw the man who was shot and killed in the home. She said that she knew the Defendant because he was a friend of her grandson, Anthony Glenn. Ms. Helton said that she saw the Defendant a few days prior to the incident.

John Glenn testified that on July 28, 2016, he lived with Kathy Helton, Anthony Glenn, and Cherry Johnson. Mr. Glenn said that on July 28, he was at home with Ms. Helton, his brother Anthony, Cherry Johnson, Tyler Barr, and Cody Cheshire. Mr. Glenn testified that he was asleep with Ms. Johnson and that around 1:00 a.m. a masked man kicked in the bedroom door. Mr. Glenn stated that the man pointed a shotgun at him and Ms. Johnson, and demanded money and drugs. He said that the gun was either a rifle or a shotgun and that the man had on a camouflage mask. Mr. Glenn said that he had previously sold methamphetamine but that he did not have any drugs in his home that night. He said that he attempted to reason with the man but that the man just kept screaming. Mr. Glenn explained that during this time, Ms. Johnson left the bedroom through a connected bathroom and went into the living room. He explained that when the man with the shotgun realized Ms. Johnson was no longer in the bedroom, the man became angry and shouted at Ms. Johnson to return to the bedroom. He said that the man with the shotgun removed his face mask but that Mr. Glenn did not recognize the man.

Mr. Glenn testified that the man with the shotgun became angrier, continued to scream, and threatened to kill everyone in the home. He said that the man was standing in the bedroom doorway. Mr. Glenn explained that he grabbed the barrel of the shotgun when the man glanced into the living room, and he and the man began hitting each other and wrestling. Mr. Glenn said that his brother ran into the bedroom and tackled the man. Mr. Glenn said he picked up the shotgun and aimed it at the man. He said he gave the man "every chance to leave," but the man charged at him, and he shot the man. Mr. Glenn said that after shooting the man, he immediately called the police. Mr. Glenn said that he did not see another intruder in the home.

Mr. Glenn testified that he did not know the man whom he shot. He said that he knew the Defendant because they went to school together. Mr. Glenn said that the Defendant also purchased methamphetamine from him. He stated that the Defendant had come to his home four or five days before the incident to purchase drugs. Mr. Glenn explained that the Defendant had arrived in a car with other people but that the Defendant

-6-

was the only one to get out of the car. He said that the next day, the Defendant came to his home on a yellow four-wheeler, chatted with him, and purchased more methamphetamine.

Detective Officer Steve Rouse testified that he investigated the incident that occurred on July 28, 2016. Detective Rouse said that he arrived at the scene of the incident and took statements from the home's occupants. Detective Rouse also located Crystal Williams and took a statement from her. He said that Ms. Williams identified photographs of the Defendant and Mr. Teague. Detective Rouse explained that the Defendant's home was searched and photographs of a four-wheeler were made. Detective Rouse stated that the clown mask and pistol were never found. Detective Rouse said that he took a statement from the Defendant, which was read to the jury. In the statement, the Defendant denied commission of any crime and confirmed that his grandmother owned a shotgun and a yellow four-wheeler. Detective Rouse explained that after he took the statement from the Defendant, the Defendant was arrested.

The trial court allowed defense counsel to read a statement to the jury containing evidence to impeach Ms. Williams's credibility. The statement noted Ms. Williams's Knox County arrest and subsequent February 13, 2011 conviction for theft. The statement noted that at the time of trial, Ms. Williams had an active felony theft arrest warrant in Knox County. The trial court instructed the jury that the statement "bears on the credibility of a witness. All witnesses are subject to that sort of impeachment. Had [Ms. Williams] been here, you would have heard that asked to her; however, due to her unavailability, you were not."

Johnny Lee Kiser testified that he is the Defendant's father and that he lived near the Defendant on July 28, 2016. Mr. Kiser said that he did not see Ms. Williams on July 28, 2016. Mr. Kiser explained that the last time he saw the Defendant was four or five days before the incident. He explained that Mr. Teague dropped off the Defendant at the Defendant's home. Mr. Kiser said that there was a woman in the car, but he could not identify her. Mr. Kiser stated that he had not met Ms. Williams until he met her at court proceedings related to this case. He said that he did not help Ms. Williams take her possessions out of the Defendant's home on July 28, 2016.

Brenda Kiser testified that the Defendant is her grandson and that he resided "next door" to her. Ms. Kiser stated that on the morning of July 28, 2016, the Defendant was in her home sleeping on her couch. She explained that the Defendant had gotten sick at work, and she let him come to her house because his home had no air conditioning. Ms. Kiser stated that if the Defendant had gotten up from the couch and left her home she would have heard her dog bark. Ms. Kiser said that she had guns in her home that belonged to her son. She also stated that she owned a four-wheeler but that it was not operational on July 28, 2016. Ms. Kiser explained that she had seen another yellow four-

wheeler in her neighborhood the day after her grandson was arrested and that police took photographs of her four-wheeler.

Upon this evidence, the jury convicted the Defendant of five counts of especially aggravated kidnapping. This appeal followed.

## I. Sufficiency

The Defendant contends that the evidence is insufficient to support his convictions for especially aggravated kidnapping. The Defendant argues that the State failed to prove his identity as the surviving perpetrator. Furthermore, the Defendant argues that there is insufficient evidence to establish the element of confinement regarding each victim. Finally, the Defendant argues that, at worst, his alleged actions only amounted to the facilitation of especially aggravated kidnapping. The State responds that the evidence is sufficient to support the Defendant's convictions for five counts of especially aggravated kidnapping.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319 (1979); *see State v. Vasques,* 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques,* 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield,* 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall,* 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton,* 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes,* 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson,* 279 S.W.3d 265, 275 (Tenn. 2009)).

Tennessee Code Annotated section 39-13-305(a) provides that "[e]specially aggravated kidnapping is false imprisonment, as defined in § 39-13-302 . . . [a]ccomplished with a deadly weapon[.]" False imprisonment occurs when a person "knowingly removes or confines another unlawfully so as to interfere with the other's liberty." *Id.* § 39-13-302(a). Especially aggravated kidnapping is a Class A felony. *Id.* § 39-13-305(b)(1).

"Criminal responsibility, while not a separate crime, is an alternative theory under which the State may establish guilt based upon the conduct of another." *State v. Dorantes*, 331 S.W.3d 370, 386 (Tenn. 2011) (quoting *State v. Lemacks*, 996 S.W.2d 166, 170 (Tenn. 1999)).

A person is criminally responsible for an offense committed by the conduct of another, if:

. . . .

(2) Acting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]

T.C.A. § 39-11-402 (2014). For a defendant to be convicted of a crime under the theory of criminal responsibility, the "evidence must establish that the defendant in some way knowingly and voluntarily shared in the criminal intent of the crime and promoted its commission." *Dorantes*, 331 S.W.3d at 386; *see State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994).

"Identity of the perpetrator is an essential element of any crime." *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006). Circumstantial evidence alone may be sufficient to establish the perpetrator's identity. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The identity of the perpetrator is a question of fact for the jury to determine. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt[.]'" *Rice*, 184 S.W.3d at 662 (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).

Viewed in the light most favorable to the State, the evidence is sufficient to establish that the Defendant was the intruder wearing the clown mask. The record reflects that Crystal Williams and James Teague drove the Defendant to the home where the incident occurred several days before the offenses to purchase methamphetamine. John Glenn testified that a few days before the incident, the Defendant drove to Mr. Glenn's home on a four-wheeler and purchased methamphetamine. Cherry Johnson testified that the Defendant purchased drugs at the home several days before the offense. Crystal Williams testified that the Defendant returned to his home carrying a pistol, a shotgun, and a scary clown mask with red hair and a white face the day of the incident. Ms. Williams stated the Defendant returned to his home without Mr. Teague "shaken up" and "freaking out." Ms. Williams said that the Defendant had previously used the clown mask to scare her dog. Ms. Williams also explained that the Defendant talked to Mr. Teague about robbing the people who sold him methamphetamine. Ms. Williams said

that the Defendant and Mr. Teague left the Defendant's home shortly after she heard this discussion. She said they left at approximately 1:30 or 2:00 a.m. Christian Barr testified that he began hearing strange noises outside the home at approximately 2:00 a.m. Cherry Johnson, Kathy Helton, Anthony Glenn, and John Glenn testified that they did not know Mr. Teague but that they were acquainted with the Defendant. There is sufficient evidence to establish the Defendant's identity as the armed intruder wearing the clown mask.

Viewed in the light most favorable to the State, the evidence is likewise sufficient to support the Defendant's five convictions for especially aggravated kidnapping. The Defendant and Mr. Teague entered the home in the middle of the night. Mr. Teague entered John Glenn and Ms. Johnson's bedroom and held them at gunpoint with a shotgun. The Defendant stood in the doorway in the living room and held Mr. Barr and Mr. Cheshire at gunpoint using a pistol. The Defendant also pointed his pistol at Anthony Glenn to keep him in the living room and at Kathy Helton to keep her from moving out of her bedroom doorway. The Defendant also pointed the pistol at Ms. Johnson as she attempted to locate a bat to use against Mr. Teague. Amy Boles attempted to enter the living room with Ms. Helton. Ms. Helton and Ms. Johnson testified that they did not feel as if they could move around in or leave the residence while the Defendant pointed the pistol at them. The evidence establishes that the Defendant used a deadly weapon to confine the individuals and substantially interfere with their liberty. Moreover, using the theory of criminal responsibility, the Defendant was responsible for Mr. Teague's confining John Glenn and Ms. Johnson in their bedroom. Thus, the evidence is sufficient, and the Defendant is not entitled to relief on this basis.

## II. Unavailable Witness

The Defendant contends that the trial court erred by failing to require the State to prove its good faith efforts to locate a missing witness before declaring that witness unavailable for trial. The State responds that the Defendant has waived appellate review of his challenge to the admission of Crystal Williams's prior testimony because the Defendant failed to provide an adequate record for review. The State also argues that the Defendant has waived appellate review of the issue by raising a different argument regarding the unavailability of Ms. Williams in his motion for new trial than he did at the trial.

The record reflects that the Defendant initially objected to the admission of Ms. Williams's preliminary hearing testimony because he was unable to cross-examine her about her prior convictions and pending charges. The Defendant's argument at his motion for new trial hearing and on appeal is that the State failed to show evidence that it made a good faith effort to locate Ms. Williams.

A pretrial hearing was held on March 26, 2018, to determine whether Ms. Williams was an unavailable witness. At the beginning of the hearing, the State explained that "we discussed [this issue] on the phone Friday[,]" and defense counsel agreed that "[w]e did." However, the Defendant did not provide a transcript of this call. In his brief, the Defendant explained that this teleconference occurred "off the record." During the hearing, the State and defense counsel made arguments regarding the unavailability of Ms. Williams. The trial court asked if the State was still attempting to find Ms. Williams, and the prosecutor responded, "I check[ed] as of yesterday afternoon and she had not been picked up." The court determined that Ms. Williams was an unavailable witness and explained, "My ruling and my reasoning will be taken down . . . so any reviewing [c]ourt would have my basis for the ruling." However, the court's March 28, 2018 order granting the State's request to have Ms. Williams declared an unavailable witness does not include the court's reasoning in declaring Ms. Williams an unavailable witness. The order states:

> On March 26, 2018, this matter came for a hearing upon the State of Tennessee's Motion to Declare Witness Unavailable. Having heard the argument of counsel for the respective parties this Court finds the State of Tennessee's Motion well taken and the motion granted over the objection of the Defendant.

The order does not refer to a pretrial teleconference, nor does the record reference any information provided to the court by the State during the teleconference. The teleconference was referenced at the pretrial hearing.

At the motion for a new trial hearing, Ms. Williams testified that she was arrested on April 16, 2018 in Blount County and that she was booked in Knox County. She said that before her arrest, she had been living in Blount County. Ms. Williams explained that she had been homeless and that she alternated staying with her sister, her niece, and her friends. Ms. Williams said that she did not have a job or phone service.

Ms. Williams testified that she recalled speaking with the prosecutor in the case following the preliminary hearing in August 2016. She said that the prosecutor informed her that the district attorney's office would contact her regarding the Defendant's trial. Ms. Williams stated that she did not keep in touch with the prosecutor because she knew a warrant had been issued for her arrest.

Detective Rouse testified that he was involved in locating Ms. Williams. He explained that in March 2018, he received information that the district attorney's office had not been able to serve Ms. Williams with as subpoena. Detective Rouse stated he contacted Ms. Williams's family members in an attempt to find her and serve the subpoena. He explained that Ms. Williams's sister informed him that Ms. Williams was homeless. Detective Rouse also spoke with Ms. Williams's niece, but the niece was

unable to provide him with Ms. Williams's location. He said that on March 2, 2018, he contacted an officer with the Blount County Sheriff's Department in his attempt to locate Ms. Williams. Detective Rouse explained that he also spoke with the U.S. Marshals Service on March 9 and informed them that he was looking for Ms. Williams and that a warrant for her arrest issued in Knox County. Detective Rouse asked for the assistance of the U.S. Marshals in locating Ms. Williams. Detective Rouse also contacted members of Mr. Teague's family, but this did not help in locating Ms. Williams. Detective Rouse said that the U.S. Marshals found and arrested Ms. Williams in April 2018, after the Defendant's trial.

Following this proof, defense counsel explained that different counsel represented the Defendant pretrial and at trial. Defense counsel argued that the pretrial teleconference was insufficient to assess Ms. Williams's unavailability under Tennessee Rule of Evidence 804. Defense counsel argued that a hearing should have been held to elicit testimony from witnesses regarding efforts made to locate Ms. Williams and regarding why she was unavailable. The State responded that the State's motion that Ms. Williams be found unavailable detailed the State's attempts to locate her. The motion included Detective Rouse's attempts and the attempts of another investigator working for the district attorney's office. The State argued that no evidentiary hearing was held because the Defendant's trial counsel objected to Ms. Williams's being declared unavailable on the basis that he would be unable to cross-examine her and introduce impeachment evidence. The State argued that defense counsel was able to present evidence of Ms. Williams's prior felony conviction and arrests at the trial. The trial court denied the Defendant's motion for new trial.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence or otherwise by law. *Id*. at 802. "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted[.]" *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972); *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979)).

Tennessee Rule of Evidence 804 provides a hearsay exception for the prior testimony of a person who is unavailable at trial. A declarant is considered unavailable if the declarant "is absent from the hearing and the proponent of a statement has been unable to procure the declarant's attendance[.]" T.R.E. 804(a)(5). If a declarant is an unavailable witness, "[t]estimony given as a witness at another hearing of the same or a different proceeding . . . if the party against whom the testimony is now offered had both an opportunity and a similar motive to develop the testimony by direct, cross, or redirect examination" will not be excluded by the hearsay rule. *Id*. 804(b)(1). "A preliminary hearing transcript is precisely the type of former testimony contemplated under

[Tennessee Rule of Evidence 804(b)(1)]." *State v. Bowman*, 327 S.W.3d 69, 88-89 (Tenn. Crim. App. 2009).

The Confrontation Clause provides a criminal defendant the right to confront and cross-examine witnesses. *See* U.S. Const. amends. VI, XIV; Tenn. Const. art. I, § 9; *State v. Williams*, 913 S.W.2d 462, 465 (Tenn. 1996). In *State v. McCoy*, 459 S.W.1, 13-14 (Tenn. 2014), our supreme court said that Article I, section 9 of the Tennessee Constitution placed no additional restrictions on the admission of hearsay statements beyond the limits of the federal constitution, as explained in *Crawford v. Washington*, 541 U.S. 36, 59 (2004). Thus, the same standards apply in interpreting a defendant's confrontation rights under the state and federal constitutions. *See State v. Hutchison*, 482 S.W.3d 893, 905 (Tenn. 2016).

In order to avoid violating a defendant's right to confront an unavailable witness, "the State must make a good faith effort to secure the presence of the person whose statement is to be offered against the defendant." *State v. Sharp*, 327 S.W.3d 704, 709 (Tenn. Crim. App. 2010) (citing *State v. Henderson*, 554 S.W.2d 117, 120 (Tenn. 1977)). "Good faith" is defined as "[t]he lengths to which the prosecution must go to produce a witness . . . [and] is a question of reasonableness." *Id.* 327 S.W.3d at 712. The evidence must also carry "its own indicia of reliability." *See State v. Monqueze L. Summers*, 158 S.W.3d 586, 597 (Tenn. Crim. App. 2004). Furthermore, the decision of the trial court will be affirmed absent an abuse of discretion. *Id.* (citing *Hicks v. State*, 490 S.W.2d 174, 179 (Tenn. Crim. App. 1972)).

The Defendant has the burden of preparing a fair, accurate, and complete account of what transpired in the trial court relative to the issues raised on appeal. *See, e.g.*, *State v. Bunch*, 646 S.W.2d 158, 160 (Tenn. 1983). This included the obligation to have a transcript of the evidence or proceedings prepared. *See* T.R.A.P. 24(b). "When the record is incomplete, or does not contain the proceedings relevant to an issue, this [c]ourt is precluded from considering the issue." *State v. Miller*, 737 S.W.2d 556, 558 (Tenn. Crim. App. 1987). Likewise, "this [c]ourt must conclusively presume that the ruling of the trial court was correct in all particulars." *Id*. (citing *State v. Jones*, 623 S.W.2d 129, 131 (Tenn. Crim. App. 1981); *State v. Baron*, 659 S.W.2d 811, 815 (Tenn. Crim. App. 1983); *State v. Taylor*, 669 S.W.2d 694, 699 (Tenn. Crim. App. 1983)); *see State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993). The Defendant refers to the teleconference with the State and the trial court as being "off the record," but the court refers to the conference when making his ruling on the record at the pretrial hearing. Without a record or summary of the substance of the call, we do not have all of the information relative to the trial court's determination that Ms. Williams was an unavailable witness. Furthermore, the Defendant failed to object to the trial court's written order, which did not detail the State's efforts to locate Ms. Williams. Thus, the Defendant has failed to provide an adequate record for review.

In any event, the State put on proof of its efforts at the motion for new trial hearing. Ms. Williams testified that she was homeless and alternated staying with different family members and friends. Ms. Williams explained that she knew there was an active warrant issued for her arrest and that she did not contact the State because she did not want to be arrested. The State issued a subpoena for Ms. Williams to testify and made efforts to have it served on her. Detective Rouse explained that he interviewed Ms. Williams's family members and others in an attempt to locate her. Detective Rouse contacted the Blount County Sheriff's office in his attempts to find the witness. Detective Rouse contacted and asked for assistance from the U.S. Marshals. We note that while the trial court's finding regarding the State's efforts to locate Ms. Williams are not detailed in the order declaring her an unavailable witness, the record reflects that there is sufficient evidence that the State made a good faith effort to locate the witness before the trial began. The Defendant is not entitled to relief on this basis.

### III. Sentencing

The Defendant contends that the trial court erred by imposing a sentence above the minimum but within the appropriate range. The Defendant argues that the court failed to consider mitigating factors or the victims' release from confinement in accord with Tennessee Code Annotated section 39-13-305(b)(2) ("If the offender voluntarily releases the victim alive or voluntarily provides information leading to the victim's safe release, such actions shall be considered by the court as a mitigating factor at the time of sentencing."). The State responds that the trial court acted within its discretion when it ordered the Defendant to serve twenty-one years' confinement.

At the sentencing hearing, defense counsel contended that there were mitigating factors for the court to consider. *See* T.C.A. § 40-35-113(13) (2018). Counsel argued that the Defendant had been a lifelong resident of Union County, had a child and an unborn child who required his support, and had a peaceable arrest. Counsel argued that the Defendant had a long record of employment, remained employed throughout the trial in this case, and continued to be a working and productive citizen until his trial began. He argued that this case was pending for almost two years and that the Defendant did not obtain any new charges during this time. Counsel also argued that the Defendant's criminal history mostly consisted of driving charges. Counsel stated that one of those convictions was for vehicular assault in 2011. Counsel did not ask the court to consider Tennessee Code Annotated section 39-13-305(b)(2), providing for mitigation for voluntary release of a victim of especially aggravated kidnapping.

The presentence investigation report stated that the Defendant had obtained his GED, had good mental and physical health, had no drug or alcohol abuse problems, and had been self-employed as a roofing contractor. The report also included the Defendant's

criminal history, which included convictions for vehicular assault, domestic assault, a traffic violation, failure to appear, possession of alcohol under age twenty-one, and theft.

The trial court considered the Defendant's presentence investigation report and arguments by counsel. The court determined that the Defendant was a Range I, standard offender and that the sentence range was fifteen to twenty-five years for each especially aggravated kidnapping conviction. The court considered the Defendant's criminal history. The court determined that the charges in this offense related to one transaction, that concurrent sentences were appropriate and that, based upon the Defendant's criminal history and the multiple victims involved in this case, the aggravating factors outweighed the mitigating factors. *See* T.C.A. §§ 40-35-113(13); -114(1),(3). The trial court noted that it also considered the Defendant's non-statutory mitigating factors filed by the Defendant. The trial court ordered the Defendant to serve a sentence of twenty-one years.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The trial court classified the Defendant as a Range I, standard offender. Especially aggravated kidnapping is a Class A felony. *See* T.C.A. § 39-13-305(b)(1). A Range I sentence for a Class A felony is 15 to 25 years. *Id*. § 40-35-112(a)(1). The trial court sentenced the Defendant to twenty-one years' confinement for each especially

aggravated kidnapping conviction.  Thus, the Defendant's sentences are within-range and entitled to a presumption of reasonableness.  *See Bise*, 380 S.W.3d at 706-07.

Moreover, the trial court considered the arguments and evidence presented at trial and the sentencing hearing.  The court reviewed the presentence report, the Defendant's criminal history, the violent nature of the Defendant's crime, and appropriate enhancement and mitigating factors.  The court articulated why the enhancement factors outweighed the mitigating factors.  On appeal, the Defendant argues that the trial court failed to consider as a mitigating factor the victims' release from confinement in accord with Tennessee Code Annotated section 39-13-305(b)(2).  However, defense counsel did not argue this mitigating factor at the sentencing hearing.  Regardless, the Defendant never released the victims.  He left the scene after John Glenn obtained control of the shotgun and killed the Defendant's fellow perpetrator.  The record supports that the court properly applied the purposes and principles of the Sentencing Act and imposed a within-range sentence.  The Defendant is not entitled to relief on this basis.

Based upon the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE